No. 02-769

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 344

STATE OF MONTANA,

      Plaintiff and Respondent,

    v.

NATHANIEL BAR-JONAH,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
                   In and for the County of Cascade, Cause No. ADC 2000-273(c),
                   The Honorable Kenneth R. Neill, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

            Gregory Jackson, Jackson Law Firm, Helena, Montana

            Don Vernay, Attorney at Law, Rio Rancho, New Mexico

      For Respondent:

            Hon. Mike McGrath, Attorney General; Pamela P. Collins,
            Assistant Attorney General, Helena, Montana

            Brant S. Light, Cascade County Attorney, Great Falls, Montana

                    Submitted on Briefs:  July 28, 2004

                            Decided:  December 7, 2004

Filed:

                               Clerk

Justice John Warner delivered the Opinion of the Court.

¶1 Nathaniel Bar-Jonah ("Bar-Jonah") appeals from a judgment and sentence entered on May 23, 2002, in the District Court for the Eighth Judicial District, Cascade County, convicting him of the offenses of Aggravated Kidnaping, Sexual Assault and Assault With a Weapon and sentencing him to a total of 130 years in Montana State Prison ("MSP") with no eligibility for parole. We affirm.

¶2 We address the following issues on appeal:

¶3 1. Did the District Court err in denying Bar-Jonah's motion to suppress evidence?

¶4 2. Did the District Court err in denying Bar-Jonah's motions requesting a second change of venue and a reordering of his trials?

¶5 3. Did the District Court err in refusing to grant Bar-Jonah's request for additional peremptory challenges and to strike the entire jury panel because of its exposure to pretrial publicity?

¶6 4. Did the District Court err in admitting into evidence two photo albums containing hundreds of photographs of children, including pictures of the victims in the present case?

¶7 5. Did the District Court err in admitting into evidence an article found in Bar-Jonah's apartment on how to tie ropes and knots and a pamphlet entitled, "Autoerotic Asphyxia?"

¶8 6. Did the District Court err in refusing to strike the pre-sentence investigation report because it was inaccurate and was prepared by a biased probation officer?

¶9 7. Did the District Court err in admitting at the sentencing hearing interviews and testimony from victims in criminal cases in which Bar-Jonah had been convicted many years

2

prior and from alleged victims of long past incidents never reported to the police?

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶10  On the morning of December 13, 1999, Detective Robert Burton ("Detective Burton"), a nine-year veteran of the Great Falls Police Department, was driving to work when he observed Bar-Jonah walking a few blocks away from an elementary school. Burton stated he was concerned when he saw Bar-Jonah walking in that area because he knew Bar-Jonah had been previously convicted in Massachusetts of the kidnaping and attempted murder of two young boys while posing as a police officer, and he had been arrested in Great Falls in 1994 for sexual assault and charged with fondling the penis of an eight-year-old boy. (The charges in that case were dismissed in May 1996 because the victim's mother refused to allow the child to testify.) Burton also stated he had observed Bar-Jonah in the same area on two prior occasions the previous week. Burton contacted dispatch and requested a patrol unit make contact with Bar-Jonah to find out what he was doing in the vicinity of the school.

¶11  Two Great Falls police officers responded to the call. Officer Brunk ("Brunk") made contact with Bar-Jonah in the 400 block of 27th Street South. It was still dark outside, so Brunk turned on his spotlight and shined it on Bar-Jonah. Bar-Jonah was wearing a dark blue police-style jacket, a knit cap, and he had his hands in his pockets. Brunk asked Bar-Jonah to come to the front of the car and remove his hands from his pockets. Bar-Jonah ignored his request even after Brunk asked him a second time to take his hands from his pockets. At that time, Officer Badgley ("Badgley") arrived. Brunk asked Bar-Jonah if he had something in his pocket and Bar-Jonah responded that he had a stun gun.

¶12  Brunk had Bar-Jonah place his hands on the patrol car and Badgley did a pat down

3

search for officer protection. Badgley found two cans of pepper spray, a toy gun, and a badge. Badgley then reviewed Montana statutes regarding impersonating a police officer and carrying a concealed weapon and contacted his shift commander, who advised him to file a report and release Bar-Jonah pending further review.

¶13 Detective Bellusci ("Bellusci"), an eighteen-year veteran of the Great Falls Police Department, and the investigating officer on the 1994 case against Bar-Jonah in which charges of sexual assault were eventually dropped, followed up on the police report from the December 13 incident. Bellusci consulted with Deputy County Attorney Julie Macek ("Macek"). Macek believed Bar-Jonah should be charged with Impersonation of a Public Servant (a police officer), in violation of § 45-7-209(1), MCA, and Carrying a Concealed Weapon (the toy gun), in violation of § 45-8-316, MCA.

¶14 On December 15, 1999, Bellusci applied for a warrant to search Bar-Jonah's residence, and the warrant was issued. The warrant stated the police believed they had probable cause to believe Bar-Jonah had committed the offenses of Impersonation of a Public Servant and Carrying a Concealed Weapon. The warrant specified the police had reason to believe they would find the following items at Bar-Jonah's residence related to those offenses:

(1) a stun gun;
(2) any police or law enforcement badges or replicas thereof or any other type of law enforcement identification, real or otherwise;
(3) any police or law enforcement clothing items or replicas thereof;
(4) any items used for purposes of detaining other individuals, including but not limited to handcuffs;
(5) any guns or replicas thereof[.]

The affidavit also requested permission to search for any other items of evidence or

4

contraband discovered in the lawful course and scope of the authorized search related to the above-described offenses.

¶15    On December 15, 1999, upon execution of the search warrant, the police seized numerous items from Bar-Jonah's apartment, including:  a blue police coat, a silver toy revolver, a silver badge, a Stunmaster stun gun, a ball cap with the logo "security enforcement," two disposable cameras, two albums with cutouts of children, one coat with a badge in the pocket and numerous photos and negatives.  Bar-Jonah was subsequently arrested and charged with Impersonation of a Public Servant and Carrying a Concealed Weapon.

¶16    On December 17, 1999, the Cascade County Attorney applied for a second search warrant.  The application for the second warrant contained the same language as that for the first warrant pertaining to probable cause and related to the same offenses, Impersonation of a Public Servant and Carrying a Concealed Weapon.  However, the second affidavit requested permission to search for developed pictures of young children or adults and undeveloped film, in addition to any other items of evidence related to the above-described offenses.  Bellusci stated he applied for the second warrant because he felt it was necessary to gather evidence to show motive for the offenses listed in the warrant.  The court signed the warrant on that date and the police searched Bar-Jonah's residence for the second time.

¶17    During the course of the second search, the police seized a bulletin board containing pictures, 28 boxes of miscellaneous papers, newspaper clippings, and other miscellaneous items.

¶18    Great Falls Police Sergeant John Cameron ("Cameron") was then assigned to

5

investigate the Bar-Jonah case. Cameron had specialized training in interviewing victims of sexual abuse. Cameron examined all of the evidence seized from Bar-Jonah's apartment. One of the items recovered in the first search of Bar-Jonah's apartment appeared to be a victim list that Bar-Jonah had written in his own handwriting. The list contained many names, including those of the victims from Bar-Jonah's previous convictions in Massachusetts, and also the name of Zachary Ramsay, a Great Falls child who disappeared early one morning while on his way to school in 1996. While reviewing the victim list, Cameron and FBI agent James Wilson ("Wilson") were able to determine that two of the names on the list belonged to children who lived in the apartment directly above Bar-Jonah. Cameron also determined that some of the photographs from disposable cameras recovered in the first search depicted those same two children in Bar-Jonah's apartment, on his couch and on his bed. The same roll of film also contained pictures of Bar-Jonah on his bed in the nude, displaying his penis in various stages of erection. Given Bar-Jonah's past history as a pedophile, Cameron became concerned the children were possible victims of sexual abuse by Bar-Jonah.

¶19 On June 29, 2000, Cameron and Wilson went to the apartment above Bar-Jonah's to request an interview with R.J., one of the children depicted in the photographs. Cameron interviewed R.J., who was fourteen years old at the time. R.J. disclosed that Bar-Jonah had sexually abused him. After interviewing R.J., Cameron and Wilson went to the residence of R.J.'s cousin, S.J. S.J. disclosed that Bar-Jonah had also sexually abused him.

¶20 In an information filed on July 5, 2000, Bar-Jonah was charged with three counts of Sexual Assault, one count of Aggravated Kidnaping and one count of Assault With a

6

Weapon. Bar-Jonah pled "not guilty" to the charges.

¶21 On November 13, 2000, Bar-Jonah filed a Motion for Change of Venue. In the motion he contended, due to the publicity which linked him to the disappearance of Zachary Ramsay ("Ramsay"), and due to the depth of feelings in Great Falls that surrounded the emotionally charged case, he could not receive a fair trial. The District Court granted the motion, ordering a change of venue for jury selection to Butte, Silver Bow County. However, jurors selected from Silver Bow County would be sequestered for the actual trial, which would be conducted in Cascade County. Trial was set to commence on January 16, 2001.

¶22 On December 6, 2000, Bar-Jonah moved to suppress the items seized during the two searches of his residence. Before the District Court heard the Motion to Suppress, the State of Montana filed charges against Bar-Jonah for the aggravated kidnaping and deliberate homicide of the Ramsay boy. Upon the filing of these charges, Bar-Jonah's counsel withdrew due to a conflict of interest. On January 2, 2001, new counsel for Bar-Jonah was appointed, and both the trial and the hearing on the suppression motion were vacated.

¶23 On January 17, 2001, the District Court held a status conference to address all charges pending against Bar-Jonah. At that conference, Bar-Jonah requested the District Court set the Ramsay homicide case for trial before the trial in the instant case due to the nationwide publicity surrounding the Ramsay case and the seriousness of the charges. The State objected, requesting the instant case be tried first, it being the oldest.

¶24 On April 25, 2001, the District Court issued an order setting this case for trial on September 10, 2001, in Butte.

7

¶25 On June 4, 2001, new counsel for Bar-Jonah filed a Motion to Suppress, to Dismiss and Supporting Memorandum. Bar-Jonah moved to suppress the items seized during the two searches of his residence on December 15 and 17, 1999, on the following basis: the searches resulted from an invalid investigative stop on December 13, 1999; the searches were based on stale information; the searches were pretextual; and the items seized far exceeded the scope of the search warrant.

¶26 On July 11, 2001, Bar-Jonah filed a Motion to Continue Trial, wherein he again requested the trial in this case be continued until after the Ramsay murder trial. Bar-Jonah argued this was the only way he could receive a fair trial in the Ramsay case.

¶27 On July 25, 2001, the District Court held a hearing on the motions to dismiss and to continue. The court reserved its ruling on both motions pending further briefing. Based upon Dr. Cohen's testimony, Bar-Jonah filed a second Motion for Change of Venue on August 8, 2001.

¶28 On August 15, 2001, the District Court issued an order denying Bar-Jonah's motions for change of venue and to continue the trial.

¶29 On August 17, 2001, the District Court issued an order denying Bar-Jonah's motion to suppress and dismiss.

¶30 On February 11, 2002, Bar-Jonah filed another Motion for Change of Venue based upon the high rate of prejudice indicated in the responses to juror questionnaires and upon negative pretrial publicity. The District Court denied the motion, and on February 19, 2002, this Court denied Bar-Jonah's Emergency Application for Writ of Supervisory Control.

¶31 The trial commenced on February 20, 2002. During the trial, the State offered as

evidence two photo albums containing thousands of pictures of children, among them several photos of one of the alleged victims. Bar-Jonah objected to the exhibits, but the District Court admitted them into evidence. The State also offered as evidence a document containing an explanation of how to tie various knots, and an article entitled "Autoerotic Asphyxia" found in Bar-Jonah's apartment. Counsel for Bar-Jonah objected, but again the District Court overruled the objection and admitted the items into evidence.

¶32 On February 25, 2002, the jury found Bar-Jonah guilty on one count each of Sexual Assault, Aggravated Kidnaping and Felony Assault, not guilty on one count of Sexual Assault, and was deadlocked on one count of Sexual Assault. The court declared a mistrial on the deadlocked count and ordered a presentence report and psychosexual evaluation.

¶33 On May 23, 2002, the District Court held a sentencing hearing in Great Falls. At the sentencing hearing, Bar-Jonah objected to the admission of pre-recorded interviews with victims of two of Bar-Jonah's previous convictions, Robert O'Connor ("O'Connor") and Allan Enrickias ("Enrickias"), on the grounds the interviews constituted improper victim impact evidence. Bar-Jonah next objected to the admission of an interview with Dr. Eric Sweitzer, a Massachusetts counselor whose testimony that Bar-Jonah was not a sexually dangerous person contributed to his release from Bridgewater Treatment Center in Massachusetts in 1991, on the grounds the interview lacked relevance. The District Court overruled Bar-Jonah's objections and allowed tapes of this testimony to be played and considered.

¶34 Bar-Jonah also objected to the testimony of Dr. Robert Fournier, who claimed to have been sexually abused by Bar-Jonah when he was a child, twenty-five years earlier. Bar-

Jonah was never charged with any offense in such alleged incident.

¶35 Lori Kicker ("Ms. Kicker"), the probation officer who prepared the presentence investigation and report ("PSI"), also testified at the sentencing hearing. Bar-Jonah moved to strike the PSI as biased because Ms. Kicker made no attempt to contact any members of his family and because he alleged she functioned as a victim's advocate in preparing the PSI, in spite of the statutory requirement to provide the court with an objective report and assessment.

¶36 The District Court found Bar-Jonah is a Level III sex offender (high level to reoffend) who poses an extreme danger to society, and his prospects for rehabilitation are virtually non-existent. The court sentenced Bar-Jonah to MSP for 10 years for Aggravated Kidnaping, 100 years for Sexual Assault, and 20 years for Felony Assault. The sentences are to be served consecutively with no possibility of parole. This appeal followed. Additional facts follow as necessary.

## II. DISCUSSION

### ISSUE ONE

¶37 **Did the District Court err in denying Bar-Jonah's motion to suppress evidence?**

¶38 We review a district court's order on a motion to suppress to determine if the court's findings of fact are clearly erroneous, and whether those findings were correctly applied as a matter of law. *State v. Clayton*, 2002 MT 67, ¶ 8, 309 Mont. 215, ¶ 8, 45 P.3d 30, ¶ 8.

¶39 Bar Jonah raises two arguments why his motion to suppress was improperly denied by the District Court. He first argues, given the totality of the circumstances, the police lacked the requisite particularized suspicion to conduct an investigative stop on December

10

13, 1999, and thus, because the information gained in that stop was used to support the probable cause necessary to issue the subsequent search warrants, any evidence gained as a result of the execution of the warrants must be suppressed. Second, Bar-Jonah argues the searches conducted on December 15 and 17, 1999, were improper because they exceeded the scope of the search warrants, the information supporting probable cause was "stale" and the searches were pretextual.

¶40 We conclude the District Court did not err when it denied Bar-Jonah's motion to suppress.

## A. The Initial Stop

¶41 Bar-Jonah contends the initial stop and questioning conducted by police in the early morning hours of December 13, 1999, constituted an improper investigative stop and police violated Bar-Jonah's right to be free from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution and Article II, § 11 of the Montana Constitution.

¶42 The standards in *Terry v. Ohio* (1968), 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, and *United States v. Cortez* (1980), 449 U.S. 411, 417-18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, have been codified in Montana at § 46-5-401, MCA, as follows:

> **Investigative stop.** In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person . . . that is observed in circumstances that create a particularized suspicion that the person . . . has committed, is committing, or is about to commit an offense.

¶43 In *Kleinsasser v. State*, 2002 MT 36, ¶ 12, 308 Mont. 325, ¶ 12, 42 P.3d 801, ¶ 12, we cited *State v. Gopher* (1991), 193 Mont. 189, 194, 631 P.2d 293, 296, wherein we set

11

forth a two-part test for determining whether particularized suspicion is present. "[I]n asserting that a law enforcement officer had the particularized suspicion to make an investigatory stop, the State has the burden to show: (1) objective data from which an experienced officer can make certain inferences; and (2) a resulting suspicion that the occupant of a certain vehicle is or has been engaged in wrongdoing . . . ."[1] *Kleinsasser,* ¶ 12.

¶44 This Court has further held:

> [W]hether particularized suspicion exists is a question of fact dependent on the totality of the circumstances. 'In evaluating the totality of the circumstances, a court should consider the quantity, or content, and quality, or degree of reliability, of the information available to the officer.' When the totality of the circumstances does not support a particularized suspicion, the investigatory stop is not justified.

*Kleinsasser*, ¶ 13 (citations omitted). However, "[a] particularized suspicion does not require that the law enforcement officer be certain that an offense has been committed."

*State v. Henderson*, 1998 MT 233, ¶ 12, 291 Mont. 77, ¶ 12, 966 P.2d 137, ¶ 12.

¶45 Bar-Jonah argues, in viewing the totality of the circumstances, the Great Falls Police Department lacked the requisite particularized suspicion of criminal activity to conduct an investigative stop. Bar-Jonah alleges his conduct on the date in question provided no objective indication of any type of criminal activity as he was simply walking down the street a few blocks from his home, minding his own business. He points out the stop occurred at least two blocks from the elementary school, there were no reports of children being

---

[1]Although *Gopher* involved the stop of a vehicle, this Court has applied this standard to non-vehicular stops. *See, e.g., State v. Jarman*, 1998 MT 277, 291 Mont. 391, 967 P.2d 1099.

anywhere in the vicinity and, although the application for search warrant contained a statement to the effect there had previously been a series of incidents reported of an unknown male in the school area who had approached children, these reports were unsubstantiated. Without citing any supporting case law, he argues the fact Detective Burton was familiar with Bar-Jonah's criminal history in and of itself is insufficient to justify an investigative stop.

¶46   The State argues the initial contact between the officers and Bar-Jonah did not rise to the level of an investigative stop, rather it was merely a police-citizen encounter, which did not implicate the Fourth Amendment or Article II, Section 11 of the Montana Constitution. *See United States v. Mendenhall*, 446 U.S. 544, 554-55, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (holding the government may stop and question any individual for any reason as long as the person to whom questions are put remains free to disregard the questions and walk away; such an encounter is not a seizure). Citing *Clayton*, ¶ 27, and *State v. Wagner*, 2003 MT 120, ¶ 31, 315 Mont. 498, ¶ 31, 68 P.3d 840, ¶ 31, the State argues under the present circumstances a reasonable person would have felt free to disregard the officer or leave. It was only when Bar-Jonah volunteered he had a stun gun in his pocket that the encounter became an investigative stop and, at that point, the officers had the "requisite suspicion to conduct the ensuing investigative stop or seizure." *See Wagner*, ¶ 32; *Clayton*, ¶ 27.

¶47   Alternatively, the State argues even if the officer's initial encounter with Bar-Jonah was a seizure, based on the totality of the circumstances, the officer had particularized suspicion prior to initiating the stop based on his knowledge of Bar-Jonah's past crimes

13

against children and his observation of Bar-Jonah walking near the elementary school, while it was still dark outside, wearing a dark police-style jacket and stocking cap, at a time when young children would be going to school.

¶48    In denying Bar-Jonah's Motion to Suppress, the District Court, relying on *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (holding mere police questioning does not constitute a seizure under the Constitution),  agreed with the State's position that the initial stop of Bar-Jonah was not an investigative stop, but was merely a police-citizen encounter.  Citing *United States v. Burton* (4th Cir. 2000), 228 F.3rd 524 (holding a police-citizen encounter may become an investigative stop), the District Court concluded the matter became an investigative detention only when Bar-Jonah admitted he was carrying a concealed stun gun, giving "the officer grounds to not only believe that a crime was being committed, but to conduct a protective search."  *See United States v. Davis* (8th Cir. 2000), 202 F.3rd 1060, 1063 ("The danger to officer safety that justifies a protective search may arise after a consensual encounter or investigative stop has commenced").  Therefore, the pat down search that produced the items, which together with other facts, formed the basis of the subsequent search warrants, was justified.

¶49    We disagree with the court's determination that the initial stop was a mere police-citizen encounter.  Under the present circumstances a reasonable person would not have felt free to leave.  In *State v. Roberts*, 1999 MT 59, ¶ 15, 293 Mont. 476, ¶ 15,  977 P.2d 974, ¶ 15, this Court held where a police officer who is armed and in uniform displays his authority by exiting his patrol car and approaching a citizen, the encounter constitutes an investigative stop, rather than a mere police-citizen encounter.  In Bar-Jonah's case, Officer

14

Brunk initiated the stop by pulling his police car over to the side of the road and shining a spotlight on Bar-Jonah in the dark. At that point, Bar-Jonah continued to walk down the sidewalk away from Brunk. As in *Roberts*, Brunk, who was armed and in uniform, demonstrated his authority over Bar-Jonah by immediately exiting his patrol car and ordering Bar-Jonah to stop. Brunk then repeatedly requested that Bar-Jonah remove his hands from his pockets and come to the front of the police car. When Bar-Jonah failed to comply, Brunk asked Bar-Jonah if he had something in his pocket he needed to be concerned about. During this time, a second uniformed officer appeared on the scene in his police car. It is clear that under these facts, the initial contact with Bar-Jonah constituted an investigative stop and not a voluntary encounter from which Bar-Jonah was free to leave.

¶50    The District Court was correct in concluding there were sufficient facts to support a particularized suspicion that Bar-Jonah had or was about to commit the offense of impersonating a police officer. In applying the totality of the circumstances test to the facts of this case, we note that Detective Burton was an experienced officer with nine years on the Great Falls Police Department at the time he dispatched officers to initiate a stop of Bar-Jonah. This Court has consistently recognized that the experience of the law enforcement officer is an important element to consider in this analysis. *Gopher*, 193 Mont. at 193, 631 P.2d at 295. Detective Burton, as an experienced law enforcement officer, could reasonably surmise that Bar-Jonah had committed, was committing, or was about to commit an offense.

¶51    The police did not rely on a single factor alone to infer Bar-Jonah was involved in criminal activity. Detective Burton believed Bar-Jonah had committed or was about to commit the offense of Impersonating a Public Servant, in violation of § 45-7-209(1), MCA,

15

which states:

> A person commits the offense of impersonating a public servant if the person falsely pretends to hold a position in the public service with the purpose to induce another individual to submit to the pretended official authority or otherwise to act in reliance upon that pretense to the individual's prejudice.

¶52 At the time the stop was initiated Detective Burton knew Bar-Jonah had previously been charged with the kidnaping and attempted murder of two young children while posing as a police officer; Burton had been involved in investigating an allegation against Bar-Jonah of sexual assault on a youth in Great Falls; Burton observed Bar-Jonah wearing a police-style jacket; Bar-Jonah was in the area of an elementary school where there were young children; and Burton had observed Bar-Jonah in that same area twice in the previous week. These known facts, combined with the deductions made in light of nine years of experience in criminal investigation, reasonably led Detective Burton to suspect Bar-Jonah was involved in criminal activity. Taking all of these factors together, we conclude the District Court properly determined there were sufficient facts at the outset to support a particularized suspicion that Bar-Jonah had or was about to commit the offense of impersonating a police officer.

¶53 We further conclude, once Bar-Jonah was lawfully detained, the officers were justified in conducting a pat down search for their own protection in accordance with § 46-5-401(2), MCA. Bar-Jonah's contention that the record does not present any evidence to suggest officers had reasonable cause to believe he was "armed and presently dangerous" is without merit. It is clear from the record that given Bar-Jonah's known criminal history and his statement that he was concealing a stun gun, the officers had sufficient reasonable cause

16

to conduct the ensuing pat down search. *See State v. Evans* (1991), 247 Mont. 218, 226, 806 P.2d 512, 517 (where this Court held a stun gun is a weapon capable of producing serious bodily harm as defined in § 45-2-101(71), (59), MCA).

¶54    The information gained from the investigative stop of Bar-Jonah was properly used to establish the probable cause necessary to issue the subsequent search warrants.

**B. The Search Warrants**

¶55    Bar-Jonah does not challenge the validity of the search warrant issued on December 15, 1999, nor does he challenge the validity of the seizure of certain items specifically described in that warrant, such as the stun gun, garments and badges, that clearly related to the stated offenses of Impersonating a Public Official and Carrying a Concealed Weapon.

¶56    However, he argues the police went beyond the scope of the warrant and also seized cameras, photo albums, film negatives and various other items that were not in any way related to the offenses named in the search warrant. Bar-Jonah argues the evidence gathered during the searches of his residence on December 15 and 17, 1999, should be suppressed because the searches exceeded the scope of the search warrants, the searches were pretextual and some of the information used to establish probable cause for the warrants was impermissibly stale. Bar-Jonah asserts that since the seizure exceeded the scope of the warrant, both in terms of the items seized and the offenses which were the subject of the search, all such items must be suppressed.

¶57    We first note that "a search and seizure, whether with or without a warrant, may not be held to be illegal if . . . any irregularity in the proceedings has no effect on the substantial rights of the accused." Section 46-5-103(1)(c), MCA.

17

¶58    Bar-Jonah alleges that certain evidence seized as a result of the searches of his residence on December 15 and 17, 1999, should be suppressed because the searches exceeded the scope of the warrants.  He argues that "only items specifically enumerated [in the search warrant] may be seized, and once those items are found, the search must stop." *See United States v. Tamura* (9th Cir. 1982), 694 F.2d 591, 595.

¶59    With regard to the search warrant of December 17, Bar-Jonah alleges  the items seized, including a bulletin board with pictures and 28 boxes of miscellaneous items, bore no relationship to the stated offenses and, therefore, also exceeded the scope of the warrant.


¶60    Finally, Bar-Jonah argues the "catchall" language contained in both the December 15 and December 17 search warrants cannot justify the overbroad searches and seizures.  Bar-Jonah contends this language exceeds that authorized by § 46-5-224, MCA, which authorizes only "evidence" or "contraband" to be seized pursuant to a warrant.

¶61    Relying on *United States v. Clark* (9th Cir. 1994), 31 F.3d 831 (holding a search warrant allowing the seizure of "fruits and instrumentalities" of an offense was overbroad), he argues, the "language in the warrant authorizing the seizure of 'fruits' is overbroad and impermissible."

¶62    The District Court correctly ruled items not described in a warrant may be seized so long as a "reasonable relationship" exists between the items seized and the search authorized. In denying the Motion to Suppress, the District Court stated, "[t]he officers performing the search[es] had reason, based on their experience, to believe the items that were not listed in

18

the search warrant but were seized, might indicate a motive for the offense of impersonating an officer and would aid in the prosecution of the case."

¶63   Consistent with the requirements of the Fourth Amendment of the United States Constitution, Article II, Section 11 of the Montana Constitution requires:

> No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

The requirements for issuing a search warrant in Montana are codified in § 46-5-221, MCA, which states:

> A judge shall issue a search warrant to a person upon application . . . made under oath or affirmation, that:
> (1) states facts sufficient to support probable cause to believe that an offense has been committed;
> (2) states facts sufficient to support probable cause to believe that evidence, contraband, or persons connected with the offense may be found;
> (3) particularly describes the place, object or persons to be searched; and
> (4) particularly describes who or what is to be seized.

Additionally, § 46-5-224, MCA, defines what may be seized pursuant to a search warrant:

> A warrant may be issued under this section to search for and seize any:
> (1)  evidence;
> (2)  contraband; or
> (3)  person for whose arrest there is probable cause, for whom there has been a warrant of arrest issued, or who is unlawfully restrained.

¶64   With respect to the items that are the subject of the search, the warrant description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized, preventing general exploratory searches and indiscriminate rummaging through a person's belongings. *United States v. Spilotro* (9th Cir. 1986), 800 F.2d 959. However, the description need only be "reasonably specific rather than elaborately

detailed." "The degree of specificity required is flexible and may vary depending on the circumstances and the type of items involved." *United States v. Holzman* (9th Cir. 1989), 871 F.2d 1496, 1508, *overruled on other grounds*.

¶65  In determining whether the scope of the search is valid, this Court has long applied the "reasonable relationship" test set forth in *State v. Quigg*, 155 Mont. 119, 132, 467 P.2d 692, 699. In applying that test to the facts of this case, we agree with the District Court that a reasonable relationship existed between the items seized and Bar-Jonah's motive for impersonating a police officer and carrying a concealed stun gun.

¶66  This Court has previously concluded where the items seized tend to establish whether or not an individual had a motive to commit the enumerated crime, it is sufficient to establish a fair probability that the items sought in a warrant application are connected to that crime. *See State v. Marks*, 2002 MT 255, ¶ 19, 312 Mont. 169, ¶ 19, 59 P.3d 369, ¶ 19 (concluding insurance and financial documents listed in the warrant were lawfully seized because they tended to establish a motive for committing the crime of arson specified in the warrant); *See generally Andresen v. Maryland*, 427 U.S. 463, 467-68, 96 S.Ct. 2737, 2742, 49 L.Ed.2d 627 (where search warrant application sought permission to search for specified documents pertaining to the sale of a specified parcel of real estate, the Court concluded documents seized that related to other parcels not specified in the warrant were lawfully seized to show petitioner's motive or intent to commit the crime stated in the warrant). The fact the items seized may be used later to help form the evidentiary basis of another charge does not require their suppression in the present case. *Andresen*, 427 U.S. at 484, 96 S.Ct. at 2750.

¶67  With respect to the search warrant of December 15, the search warrant application

set forth the basis for the officer's belief that Bar-Jonah may have been impersonating a police officer and carrying a concealed stun gun on December 13, 1999, in an effort to kidnap and either molest or murder a child. Picture albums containing hundreds of photos of children, loose photos of children, undeveloped film and the other items at issue were reasonably related to Bar-Jonah's motive for impersonating a police officer and carrying a concealed stun gun. Further, the disposable cameras and undeveloped film might reasonably be expected to contain photos of Bar-Jonah dressed as a police officer, or photos of possible victims of assault or molestation.

¶68     With respect to the items seized pursuant to the warrant dated December 17, it was reasonable for the police to return to Bar-Jonah's residence to sort through the numerous other boxes containing photographs and paper clippings to determine if any of those items would provide additional evidence of Bar-Jonah's motive for impersonating a police officer.

¶69     Based on all the facts and circumstances, we conclude the description of items to be seized contained in the December 15 and 17, 1999, warrants were specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized so as to not violate Bar-Jonah's constitutional rights and the officers had adequate reason to believe, based on their experience, common sense and knowledge of Bar-Jonah's criminal history, that the items in question (photo albums, disposable cameras, undeveloped film, and the three articles introduced at trial) were reasonably related to the criminal behavior enumerated in the warrant application.

¶70     With respect to the items not entered into evidence at trial, the issue of whether their seizure was proper is moot and any error was harmless because Bar-Jonah's substantial

21

rights were not affected. Section 46-5-103(1)(c), MCA. The fact that some of the items in question may have later been used by police as an evidentiary basis in filing charges against Bar-Jonah in the Ramsay case does not require us to suppress such evidence with respect to the instant case. *See Andresen*, 427 U.S. at 484, 96 S.Ct. at 2750.

*Pretextual Searches*

¶71 Bar-Jonah next argues the searches that took place on December 15 and 17, 1999, were both "pretextual" searches in which the police were actually seeking evidence related to the disappearance of Ramsay. He contends the police returned the stun gun, police badge and other items to him when they stopped him on December 13, 1999, because they intended to use those items as a "pretext" to gain access to Bar-Jonah's residence to search for evidence of more serious crimes. He further contends, because the Federal Bureau of Investigation ("FBI") participated in both searches, the searches were a pretext to gather evidence for the Ramsay case, as the FBI would not have involved itself had the charges been purely for impersonating a police officer and carrying a concealed weapon.

¶72 Finally, Bar-Jonah suggests his right to privacy has been violated under the Montana Constitution and accordingly, the evidence should be suppressed. However, Bar-Jonah does not cite any authority for this argument, in violation of Rule 23(a)(4), M.R.App.P. Therefore, we decline to address it on appeal.

¶73 The record does not support Bar-Jonah's contention that the searches were pretextual. First, Officer Badgley testified at the suppression hearing that the reason he did not arrest Bar-Jonah on December 13 was because he was not sure if a stun gun qualified as a weapon in Montana. Therefore, upon the advice of his superior officer, he returned the items to Bar-Jonah and let him go home until the police had a chance to investigate the issue further. Bar-Jonah did not present any evidence to contest this testimony. As probable cause existed for issuance of the search warrant, the officer's subjective intent in securing the warrant was irrelevant. *See Whren v. United States* (1996), 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135

L.Ed.2d 89 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"); *followed in State v. Farabee,* 2000 MT 265, ¶ 29, 302 Mont. 29, ¶ 29, 22 P.3d 175, ¶ 29 ("We have never held . . . that an otherwise objectively justifiable traffic stop is nonetheless unlawful because a law enforcement officer used the stop to investigate a hunch about other criminal activity").

¶74 Even were we to consider a subjective motive of law enforcement in securing the warrants, a search is "pretextual" only when the motivation or primary purpose of the arresting officers is to arrest a defendant for a minor offense so as to allow police to search for evidence of some other unrelated offense for which the police lack probable cause to arrest or search. *United States* v. *Mota* (9th Cir. 1993), 982 F.2d 1384, 1386. Here, as in *Mota*, the fact that Bar-Jonah was arrested for one offense, but the searches revealed evidence that may have supported the charge of an even more serious offense, is not sufficient to conclude the searches were pretextual. Further, the searches were "reasonably related" to the nature and purpose of Bar-Jonah's subsequent arrest for Impersonating a Public Official and Carrying a Concealed Weapon. Additionally, the two-day delay in obtaining a search warrant was justified by the officer's desire to ensure Bar-Jonah could be properly arrested for the offenses stated in the warrant. Once officers were sure of the law in this regard, they acted with due diligence to execute the search warrant to secure the evidence necessary to charge Bar-Jonah with those offenses. *See Williams v. United States* (9th Cir. 1969), 418 F.2d 159, 161. Accordingly, we hold the searches of Bar-Jonah's residence on December 15 and 17 were not pretextual.

¶75 Bar-Jonah contends information in the applications for the December 15 and 17 search warrants was "stale" and could not be used to support probable cause. He argues the only instance the police could point to in which he utilized a "police badge" in the commission of a crime occurred 22 years prior. He also argues the police should not have relied on his 1993 arrest for sexual assault in support of the application because the case was dismissed in May 1996, and the charge was therefore unsubstantiated. He argues that under any legal standard, the information was "stale."

¶76 Contrary to Bar-Jonah's contention that the information in the applications for search warrant is stale under "any standard," applying the appropriate standard in Montana to the facts in this case, we hold the information was not stale, and thus was proper for use in supporting a determination of probable cause.

> A determination of whether information is too stale to be considered in establishing probable cause depends largely on the nature of the activity at issue. Where criminal activity is continuing in nature, information which would be stale when considered individually will carry greater weight in a probable cause determination when combined with more recent information. [Citations omitted.]

*State v. Anderson*, 1999 MT 60, ¶ 14, 293 Mont. 490, ¶ 14, 977 P.2d 983, ¶ 14; *See also State v. O'Neill* (1984), 208 Mont. 386, 395, 679 P.2d 760, 765.

¶77 In *Anderson* this Court concluded that where an informant provided information related to the defendant's drug-related activities between 7 and 10 months prior to the search and seizure, the defendant had drug-related arrests 5 years and again 7 months prior to the search; and during the search, drugs were discovered in the trailer where Anderson was

staying, a "pattern of continuous conduct" was demonstrated and the information was not stale for purposes of determining probable cause. *Anderson*, ¶ 14.

¶78   Similarly, in Bar-Jonah's case, the warrant applications established Bar-Jonah was a sexual offender whose prior convictions for kidnaping and attempted murder entailed the use of a police badge and handcuffs, making it reasonable for the police to conclude his *modus operandi* in gaining the confidence of young children was to impersonate a police officer; he was arrested again in 1993 for the sexual assault of a child, but the charges were subsequently dismissed; when police encountered Bar-Jonah near the elementary school on December 13, 1999, he was wearing a police-style jacket and was carrying a badge, stun gun and pepper spray. Taken together, these facts demonstrate a "pattern of continuous conduct" sufficient to support probable cause.

¶79   Therefore, we agree with the District Court "[t]he fact that the information of Mr. Bar-Jonah's prior conduct spanned a time frame from 1977 to 1993 does not disqualify it from being valid data to be considered with more recent information in determining whether or not a search warrant should be issued, and thus it is not impermissibly stale as the Defendant contends." Further, under the totality of the circumstances test set forth in *Illinois v. Gates* (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, and adopted in Montana in *Gopher*, these facts were sufficient to establish probable cause.

### ISSUE TWO

¶80   **Did the District Court err in denying Bar-Jonah's motions requesting a second change of venue and a reordering of the trials?**

¶81   In reviewing a district court's denial of a motion for change of venue, this Court has

26

held that it will only reverse the District Court's decision upon a showing of an abuse of discretion. *State v. Hill*, 2000 MT 308, ¶ 50, 302 Mont. 415, ¶ 50, 14 P.3d 1237, ¶ 50. Our standard in reviewing a district court's denial of a motion for continuance is whether the district court abused its discretion. *State v. Root*, 1999 MT 203, ¶ 13, 296 Mont. 1, ¶ 13, 987 P.2d 1140, ¶ 13.

¶82 Section 46-13-203, MCA, provides for a change in the place of a criminal trial:

(1) The defendant or the prosecution may move for a change of place of trial on the ground that there exists in the county in which the charge is pending such prejudice that a fair trial cannot be had in the county.
(2) If the District Court determines that there exists in the county in which the prosecution is pending such prejudice that a fair trial cannot be had, the District Court shall:
(a) transfer the cause to any other county in which a fair trial may be had;
(b) direct that a jury be selected in any county where a fair trial may be had and then returned to the county where the prosecution is pending to try the case; or
(c) take any other action designed to ensure that a fair trial may be had.

¶83 Mere allegations of prejudicial pre-trial publicity are an insufficient basis on which to grant a motion for change in the place of trial. Rather, facts must be shown creating a "reasonable apprehension" that a fair trial cannot be had. *See State v. Link* (1991), 194 Mont. 556, 560, 640 P.2d 366, 368. The defendant must show the pre-trial publicity actually inflamed community prejudice to such an extent the defendant is denied a fair trial. *State v. Moore* (1994), 268 Mont. 20, 51, 885 P.2d 457, 477, *overruled on other grounds*.

¶84 Based on the testimony of Dr. Allan Cohen ("Cohen"), his jury consultant in the Ramsay case, Bar-Jonah contends the adverse publicity in this case was "inflammatory" and prejudiced the community to the extent that "a clear and present danger" existed to Mr. Bar-

27

Jonah's right to a fair trial in Silver Bow county. Therefore, the District Court erred in not granting Bar-Jonah's motion to continue and second motion for change of venue. Bar-Jonah also argues a "majority of the jurors had prior specific knowledge either of the pending homicide charges or of Mr. Bar-Jonah's criminal history . . . adding to the highly charged atmosphere that surrounded the trial of this case."

¶85 Our review of Dr. Cohen's testimony and media penetration study, upon which Bar-Jonah relies, leads us to the conclusion that the District Court did not abuse its discretion in deciding, while facts reported in the media relating to the alleged kidnaping, murder and cannibalism of Zachary Ramsay could not help but arouse strong feelings in the community against Bar-Jonah, the news reporting did not go beyond the objectivity expected of the press. For example, Dr. Cohen suggests in his survey the news articles prejudiced Bar-Jonah by including "sullen-looking" pictures of him next to smiling pictures of Zachary Ramsay. However, we conclude these pictures were not prejudicial or inflammatory.

¶86 Additionally, while Dr. Cohen's survey indicated the media penetration in Cascade and Silver Bow Counties was higher than in Yellowstone County, even Dr. Cohen admitted if the trial had been moved a second time to Yellowstone County, the media coverage would have increased there as well. Therefore, we agree with the District Court that moving the trial a second time from Silver Bow to Yellowstone County would have served no useful purpose.

¶87 Furthermore, § 46-13-203(2), MCA, preserves the court's options to take any other action, short of a change of venue, to ensure he would receive a fair trial. The District Court took the appropriate steps to ensure that he would still receive a fair trial. For example, the

28

court granted the initial change of venue from Cascade County, where the majority of the media coverage took place, to Silver Bow County; the court issued an extensive supplemental jury questionnaire that was jointly prepared by the State and Bar-Jonah's defense counsel; and the court allowed liberal individual voir dire on the issues that would tend to expose whether or not prospective jurors were so biased they could not lay aside their pre-trial opinions and render a verdict based on the evidence presented in court.

¶88     Following our decision in *State v. Sullivan* (1994), 266 Mont. 313, 321, 880 P.2d 829, 834-35, we decline to find an abuse of discretion based on the mere existence of any preconceived notion as to the guilt or innocence of an accused, rather, we hold, sufficient impartiality is established if the juror can lay aside his opinion and render a verdict based on the evidence presented.  *See also State v. Armstrong* (1980), 189 Mont. 407, 422-23, 616 P.2d 341, 350 (holding the district court properly denied Armstrong's motion for an opinion survey where the court gave Armstrong the opportunity to dig out and expose, through voir dire examination, any bias or prejudice that would have prevented a fair trial and the voir dire examination failed to reveal any such prejudice); *State v. Falls Down*, 2003 MT 300, ¶ 27,  318 Mont. 219, ¶ 27, 79 P.3d 797, ¶ 27 (potential juror was not subject to removal for cause in prosecution for deliberate homicide even though she assumed the defendant was guilty when she first read about the incident, because she said she could follow the court's instructions in basing her decision solely on evidence presented in the courtroom).  Nothing in the record indicates the jurors in Bar-Jonah's case failed to decide the issues based solely on the evidence presented at trial.

¶89     Additionally, Bar-Jonah has failed to demonstrate that he was prejudiced by the

decision to hold the trial in Butte. Bar-Jonah concedes that during voir dire, each juror assured that they would act with impartiality. The jury's impartiality was evidenced in the fact that the jury deadlocked on one count of sexual assault and acquitted Bar-Jonah of one count of sexual assault. A judgment may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial. Section 46-20-701(2), MCA.

¶90    Regarding the motion to continue, which requested that the trial in this case be postponed until after the Ramsay trial, the record shows that Bar-Jonah's motion was based on his concern that his trial in this case could prejudice his trial in the Ramsay capital homicide case, not the other way around. That case was ultimately dismissed. So, Bar-Jonah obviously cannot establish that the order of the trials adversely affected him. In any case, the District Court did not abuse its discretion in setting the trial in the instant case first, as this case was filed before the Ramsay case; the alleged victims were children whose memories could be affected by further delay; and the victims were entitled to a timely resolution of their allegations against Bar-Jonah.

### ISSUE THREE

¶91    **Did the District Court err in refusing to grant Bar-Jonah's request for additional peremptory challenges and to strike the entire jury panel for its exposure to pretrial publicity?**

¶92    Bar-Jonah asserts the pre-trial publicity in this case made it impossible for him to select an impartial jury. Therefore, he argues, his motion to strike the entire jury panel should have been granted. He further asserts, in spite of the statutory grant of an equal number of

30

peremptory challenges to the defense and prosecution in a non-capital criminal case, the District Court should have granted him additional peremptory challenges to assist his counsel in selecting a jury "untainted by the hoards of negative publicity." Finally, Bar-Jonah asserts the failure of the court to grant his motion for additional peremptory challenges violated his right to a fair and impartial trial by jury under the Sixth and Fourteenth Amendments of the United States Constitution and Article II, Sections 17 and 24 of the Montana Constitution, and that his constitutional rights should have taken precedence over the controlling statute, § 46-16-116, MCA.

¶93   The State argues Bar-Jonah is barred from raising the constitutional challenge on appeal because he did not make this argument in the court below. The rule is well established that a party may not raise new arguments or change his legal theory on appeal. *State v. Heath*, 2004 MT 58, ¶ 39, 320 Mont. 211, ¶ 39, 89 P.3d 947, ¶ 39. While this Court may discretionarily review claimed errors that implicate a criminal defendant's fundamental constitutional rights, even if no contemporaneous objection is made, we decline to do so here, as our refusal to do so will not result in a manifest miscarriage of justice. *See State v. Finley* (1996), 276 Mont. 126, 137, 915 P.2d 208, 215, *overruled on other grounds*.

¶94   Further, Bar-Jonah offers no legal support for his theory that the District Court abused its discretion when it declined to allow him additional peremptory challenges beyond the six provided by statute. Rule 23(a)(4), M.R.App.P., states the argument portion of an appellant's brief "shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and pages of the record relied on." *See Heath*, ¶ 32. Absent any citation of authority, we decline to address

31

this issue. *See, e.g., State v. Strauss*, 2003 MT 195, ¶ 51, 317 Mont. 1, ¶ 51, 74 P.3d 1052, ¶ 51.

¶95    With regard to Bar-Jonah's motion to strike the entire jury panel, Bar-Jonah does not even allege why any individual juror should have been excused for cause, much less the entire panel. He received assurances from each prospective juror that he or she would act impartially. Nevertheless, Bar-Jonah has failed to cite authority for his contention. Again, we decline to address an issue when the appellant fails to cite supporting authority. *See State v. Ellenburg*, 2000 MT 232, ¶ 49, 301 Mont. 289, ¶ 49, 8 P.3d 801, ¶ 49. On this basis, we refuse to conclude the District Court erred when it denied Bar-Jonah's motion to strike the entire jury panel.

## ISSUE FOUR

¶96    **Did the District Court err in admitting two photo albums containing hundreds of photographs of children, including pictures of the child victims in the present case?**

¶97    Rulings regarding the admissibility of evidence are left to the sound discretion of the trial court, and will not be overturned absent a showing of manifest abuse of discretion. *State v. Ford* (1996), 278 Mont. 353, 361, 926 P.2d 245, 250. It is also well-established that a district court's weighing of potential prejudice against probative value will be upheld absent an abuse of discretion. *State v. Laird* (1987), 225 Mont. 306, 312, 732 P.2d 417, 421. This Court also applies the abuse of discretion standard when reviewing a trial court's decision on whether to admit evidence of other crimes, wrongs, or acts. *State v. Aakre*, 2002 MT 101, ¶ 8, 309 Mont. 403, ¶ 8, 46 P.3d 648, ¶ 8.

¶98    Bar-Jonah argues the District Court erred when it admitted into evidence two photo

32

albums containing hundreds, possibly thousands, of pictures of young children, only a few of which were of the alleged victims in this case. First, he argues the albums should not have been admitted because the photos of children other than the alleged victims were not relevant. Second, he argues the albums should not have been admitted because Bar-Jonah submitted two motions in limine to keep them out and the State had given prior assurances that it would not introduce any evidence of other crimes, wrongs or acts, under Rule 404(b), M.R.Evid. Third, he argues the albums should not have been admitted because they were highly prejudicial and were therefore inadmissible under Rule 403, M.R.Evid. Fourth, he argues the albums should not have been admitted because they were inadmissible character evidence under Rule 404(b), M.R.Evid. Bar-Jonah contends, the admission of this evidence was even more egregious because the prospective jurors had prior knowledge of his criminal history or of the horrendous charges pending against him in the Ramsay case. He argues the evidence branded him as a pedophile and influenced the jury to convict him for "who he is, rather than for what he allegedly had done." Bar-Jonah makes these assertions citing the "Modified Just Rule."[2]

¶99    Rule 401, M.R.Evid., defines relevant evidence as:

[E]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable

---

[2]The "Modified Just Rule" was adopted in *State v. Matt* (1991), 249 Mont. 136, 814 P.2d. 52, and sets forth the criteria for admitting evidence of other crimes, wrongs, or acts under Rules 404(b) and 403, M.R.Evid., as follows: The other crimes, wrongs or acts must be (1) similar and (2) not too remote in time; (3) the evidence of other crimes, wrongs or acts is not admissible to prove the character of a person to show action in conformity with such character, but may be admissible for other purposes, such as proof of motive . . . and (4) although relevant, the evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . .

than it would be without the evidence. Relevant evidence may include evidence bearing upon the credibility of a witness or hearsay declarant.

This standard is meant to allow wide admissibility of circumstantial evidence limited only by Rule 403, M.R.Evid., or other special relevancy rules. *State v. Buckingham* (1989), 240 Mont 252, 259, 783 P.2d 1331, 1336. Additionally, in *Havens v. State* (1997), 285 Mont. 195, 200, 945 P.2d 941, 944, this Court set forth the rule that evidence is relevant and admissible if the state is able to demonstrate a link between the evidence and the fact or element in question. *See also State v. Ingraham*, 1998 MT 156, ¶ 42, 290 Mont. 18, ¶ 42, 966 P.2d 103, ¶ 42.

¶100  In *Laird*, 225 Mont. at 312, 732 P.2d at 421, this Court held "dirty" magazines found during a search of Laird's apartment were relevant because they tended to buttress the victim's credibility. In *State v. Hall* (1990), 244 Mont. 161, 169-70, 797 P.2d 183, 188-89, we held the trial court in a child sexual assault case did not abuse its discretion by finding relevant the testimony of a police officer who stated the defendant told him he had masturbated the day before the assault in the same storage room where the assault took place because the evidence was useful in establishing why police had concentrated on the defendant as opposed to other persons who had been patrons of the library at or near the time in question. Similarly, in *Ford*, 278 Mont. at 363, 926 P.2d at 250, this Court held evidence of Ford's sexual preference was relevant because he was charged with sexual intercourse without consent of a person of the same gender. The evidence that Ford was bisexual was relevant to whether Ford fit the profile of someone who would commit the act for which he was accused.

¶101 Bar-Jonah's contention that the albums were not relevant is simply not supported by the record or the pertinent case law. The State proved the relevancy of the photo albums by linking them to Bar-Jonah's motive for befriending the boys, for enhancing the credibility of the victim witnesses, and to rebut Bar-Jonah's asserted defenses.

¶102 We also conclude the District Court did not abuse its discretion because admission of the photo albums was not unfairly prejudicial under Rule 403, M.R.Evid. In *Ford,* this Court held the probative value of the evidence that Ford was bisexual was not substantially outweighed by the danger of unfair prejudice. *Ford*, 278 Mont. at 363, 926 P.2d at 251. Similarly, in *Laird*, this Court held since the "dirty" magazines were necessary to corroborate the victim's testimony, they were not unfairly prejudicial, and it was within the trial court's discretion to allow their admission as physical evidence. *Laird*, 255 Mont. at 312, 732 P.2d at 421.

¶103 We conclude the facts in this case are not dissimilar to those in *Ford* and *Laird.* Therefore, we hold that on balance, the District Court did not commit error in finding the probative value of the photo albums outweighed any prejudice to Bar-Jonah in introducing them into evidence. We further hold the photo albums did not constitute impermissible evidence of other crimes, wrongs or acts as asserted by Bar-Jonah.

¶104 Even if the photo albums could be construed to reflect on Bar-Jonah's character, they were clearly not offered for that purpose. Rather, the record reflects the albums were primarily offered as proof of Bar-Jonah's motive to befriend young boys. As such, it squarely falls under the exception to the inadmissibility of character evidence provided for in Rule 404(b), M.R.Evid. Furthermore, as we held in *State v. Daniels*, 2003 MT 247, ¶ 45,

35

317 Mont. 331, ¶ 45, 77 P.3d 224, ¶ 45, Rule 404(b), M.R.Evid., is not applicable simply because the evidence implies the defendant is of bad character.

**¶105 Did the District Court err in admitting into evidence an article found in Bar-Jonah's apartment on how to tie rope knots and a pamphlet entitled, "Autoerotic Asphyxia"?**

¶106 Rulings regarding the admissibility of evidence are left to the sound discretion of the trial court, and will not be overturned on appeal absent a showing of manifest abuse of discretion. *Ford*, 278 Mont. at 361, 926 P.2d at 250.

¶107 Bar-Jonah contends the District Court erred when it admitted into evidence three of the State's exhibits in spite of Bar-Jonah's objections that the exhibits constituted hearsay, lacked foundation, were irrelevant and were highly prejudicial. All three exhibits in question were seized during the searches of Bar-Jonah's residence in December 1999. The first exhibit, Exhibit 91, is an article entitled "The Right Ropes, The Top Knots," which contained an explanation, ten diagrams and instructions on how to tie knots. The other two exhibits are Exhibit 92-A, a pamphlet entitled "AutoErotic Asphyxia," and 92-B, an envelope addressed to Bar-Jonah from "Bereaved Parents, Inc.," the organization that generated the pamphlet.

¶108 Bar-Jonah further argues the doctrine of cumulative error should apply in this case to warrant a reversal of the judgment. The doctrine of cumulative error refers to a number of errors, which taken together, prejudice a defendant's right to a fair trial. *State v. Ottwell* (1989), 239 Mont. 150, 157, 779 P.2d 500, 504. Under this doctrine, once such accumulated errors are identified as having prejudiced a defendant's right to a fair trial, reversal is required. *State v. Enright*, 2000 MT 372, ¶ 34, 303 Mont. 457, ¶ 34, 16 P.3d 366, ¶ 34.

¶109 The trial court overruled Bar-Jonah's objections to all three exhibits. The court agreed with the State's argument that Exhibit 91 was directly relevant to the incident in which Bar-Jonah allegedly put a noose around S.J.'s neck and hung him from the ceiling. The court also agreed with the State's argument that Exhibits 92-A and 92-B were relevant because they talked about tying a noose around one's neck to gain sexual arousal. In overruling Bar-Jonah's objections, the court also ruled the exhibits did not constitute hearsay.

¶110 Bar-Jonah now argues the District Court's ruling that Exhibit 93, an article on autoerotic death, was inadmissible, proves that the District Court improperly admitted Exhibits 92-A and 92-B, which contained similar content, thereby justifying a reversal in this case.

¶111 With respect to Exhibit 91, it is clearly relevant and admissible to corroborate S.J.'s testimony that Bar-Jonah placed a rope around his neck and hung him from the ceiling. It did not constitute hearsay as its purpose was not to prove that the ropes were the "right ones" and the knots were the "top knots," but to show that Bar-Jonah was interested in ropes and knots. The District Court did not err in admitting Exhibit 91.

¶112 In spite of Bar-Jonah's failure to include in the record a copy of Exhibit 93, upon our review of the record and of the content of Exhibits 92-A and 92-B, we conclude the District Court did not err in finding Exhibits 92-A and 92-B were relevant to corroborate the testimony of S.J. that Bar-Jonah put a rope around his neck and choked him. These exhibits do not constitute hearsay, as they were offered to prove Bar-Jonah performed the act of choking S.J., not to prove the truth of the contents of the exhibits. Also, the District Court

38

was in a better position than this Court to determine whether the content of Exhibit 93 was sufficiently different in nature from the content of Exhibits 92-A and 92-B to justify the court's admission of these exhibits, while excluding Exhibit 93.

¶113   Since Bar-Jonah was not prejudiced by the errors alleged, we will not apply the doctrine of cumulative error.

## ISSUE SIX

¶114   **Did the District Court err in refusing to strike the pre-sentence investigation and report because Bar-Jonah alleged it was inaccurate and was prepared by a biased probation officer?**

¶115   This Court reviews a District Court's imposition of sentence for legality only.  *State v. Montoya*, 1999 MT 180, ¶ 15, 295 Mont. 288, ¶ 15, 983 P.2d 937, ¶ 15.  On sentencing questions regarding statutory interpretation, we review the trial court's interpretation of the law to determine whether it is correct.  *Montoya*, ¶ 16.  When the issue on appeal concerns whether the district court violated the defendant's constitutional rights at sentencing, the question is a matter of law which we review *de novo* to determine whether the district court's interpretation of the law is correct.   *State v. Mason*, 2003 MT 371, ¶ 19, 319 Mont. 117, ¶ 19, 82 P.3d 903, ¶ 19.

¶116   Bar-Jonah alleges the District Court erred in not granting his motion to strike the PSI because the probation officer, Ms. Kicker, did not contact Bar-Jonah's family in preparing the social history.  He argues this shows the PSI was inaccurate, and that Ms. Kicker was unfairly biased.  Bar-Jonah also argues such bias is shown because Ms. Kicker testified one of her roles in preparing the PSI was to act as a victim's advocate.

¶117 The District Court did not err in denying Bar-Jonah's motion to strike the PSI. Section 46-18-111(1), MCA, requires the district court to direct a probation officer to prepare a PSI when a defendant is found guilty of a felony offense. The district court is required to "consider" the PSI prior to sentencing, § 46-18-111(1), MCA, however, there is "no requirement that the sentencing judge adopt the recommendation of the [PSI]." *State v. McPherson* (1989), 236 Mont. 484, 491, 771 P.2d 120, 124, *overruled on other grounds*. Section 46-18-112, MCA, requires the probation officer to "promptly inquire into and report on" such things as "the defendant's criminal record and social history" and "the harm caused, as a result of the offense, to the victim, the victim's immediate family, and the community."

¶118 The statute does not specify how the probation officer is to go about compiling this information. Bar-Jonah would have this Court believe that in compiling the social history, the probation officer is required by statute to make direct contact with the defendant's family. This requirement is neither stated in the plain language of the statute, nor is it implied. This Court has never held that in preparing the PSI, the probation officer is required to contact the defendant's family members. The standard set forth repeatedly by this Court is that "a defendant is entitled to have his sentence predicated on substantially correct information." *See, e..g., McPherson*, 236 Mont. at 490, 771 P.2d at 123-24. We have further held, "[this] Court, however, will not strain at worst-case assumptions in order to find a mistake and we presume the District Court to be correct." *McPherson*, 236 Mont. at 490, 771 P.2d at 124.

¶119 Here, the District Court based its sentence on a PSI prepared by defendant's probation officer, as required by § 46-18-111, MCA; on the psychological evaluations of Bar-Jonah's

own psychologists, Drs. Beljan and Espy; and on the sexual offender report prepared by Dr. Michael Scolatti. We hold that these documents adequately substantiate the court's rationale and that they come within the purview of substantially correct information as required by this Court.

¶120   With regards to the alleged bias of Ms. Kicker in preparing the PSI, Bar-Jonah's allegation that he is entitled to be re-sentenced because Ms. Kicker somehow infected the court with a bias against him is not supported by the record. As stated above, a convicted defendant has a due process right against a sentence predicated on misinformation. *Mason*, ¶ 21; *Kills on Top v. State*, 2000 MT 340, ¶ 67, 303 Mont. 164, ¶ 67, 15 P.3d 422, ¶ 67. However, the defendant is under an affirmative duty to show the alleged misinformation is materially inaccurate or prejudicial before a sentence will be overturned. *Mason*, ¶ 21; *Kills on Top*, ¶ 67. A mere claim the information is invalid is insufficient. *State v. Radi* (1979), 185 Mont. 38, 41, 604 P.2d 318, 320. The District Court record is void of any indication the court relied on materially inaccurate or unreasonably biased information in sentencing Bar-Jonah. On the contrary, Bar-Jonah's counsel admitted at the sentencing hearing that all of the experts making recommendations to the court, including Bar-Jonah's own experts, testified that Bar-Jonah should receive the maximum sentence of 130 years. The only question, according to Bar-Jonah, was whether he should serve his time in MSP or at Warm Springs. The District Court concluded from all of the reports and evidence presented at the sentencing hearing:

> [Bar-Jonah] is a repeat offender almost certain to offend again if given the opportunity; did not suffer from a mental disease or defect at the time of commission of these acts such that he was unable to appreciate the criminality

41

of his acts or conform his behavior to the requirements of the law; does not accept responsibility for his acts; is unlikely to respond to or even cooperate with treatment; and is an extreme danger to society. The prospects of rehabilitation are virtually non-existent.

¶121 Additionally, Bar-Jonah was provided a copy of the PSI before the sentencing hearing. The court provided him the opportunity to explain, argue and rebut the information contained therein. We conclude that Bar-Jonah has not proven Ms. Kicker was biased in her preparation of the PSI or that the sentencing court abused its discretion in sentencing Bar-Jonah. Accordingly, Bar-Jonah is not entitled to be re-sentenced.

## ISSUE SEVEN

¶122 **Did the District Court err in admitting interviews and testimony at the sentencing hearing from victims in criminal cases in which Bar-Jonah had been convicted many years prior and from alleged victims of long past incidents never reported to the police?**

¶123 Bar-Jonah contends his right to confront and cross-examine witnesses under Article II, Section 24 of the Montana Constitution and the Sixth and Fourteenth Amendments of the United States Constitution were violated when the sentencing court allowed testimony from three witnesses who, according to Bar-Jonah, had "no connection whatsoever to the offenses of which [he] was convicted," and whom he had no chance to cross-examine. Bar-Jonah also argues his rights were violated because he was not provided with any notice of the testimony from these witnesses, and because the court allowed testimony from Dr. Fournier, who claimed to have been sexually assaulted by Bar-Jonah over 30 years ago, but who never reported this event to the police.

¶124 We reject Bar-Jonah's argument that his constitutional right to confront and cross-

examine witnesses was violated at the sentencing hearing. Bar-Jonah failed to object on this ground in the court below, thereby waiving his right to appeal on this issue. As stated with regard to Issue Three of this Opinion, the rule is well established that a party may not raise new arguments or change his legal theory on appeal. *Heath*, ¶ 39. While this Court may discretionarily review claimed errors that implicate a criminal defendant's fundamental constitutional rights, even if no contemporaneous objection is made, we decline to do so here, as our refusal to do so will not result in a manifest miscarriage of justice. *See Finley*, 276 Mont. at 137, 915 P.2d at 215.

¶125 We conclude the District Court did not err in considering the testimony of these three witnesses.

### III. CONCLUSION

¶126 Based on the foregoing, we affirm the judgment and sentence of the District Court.


/S/ JOHN WARNER


We Concur:

/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART