JUSTICE RICE
dissenting.
¶112 I respectfully dissent. The Court fails to reference or properly apply the statutes and case law, thereby radically altering common law marriage in Montana, and failing to honor the reliance that many couples place in the law. I will begin with the Court’s opinion, then turn to the claims pled by the Appellants in the District Court, and conclude with a response to the concurrence.
¶113 Before turning to the legal analysis, two preliminary points must be made. First, the Court’s opinion does not address the issues which were pled by the Appellants. No part of the rationale upon which the Court resolves this case-that the Affidavit process fails to establish a common-law marriage — was a part of the challenge filed by the Appellants in the District Court. Indeed, the Appellants pled precisely the opposite, arguing that the policy is discriminatory for the very reason that the University grants benefits based upon marriage, including common-law marriage. As stated in their Complaint:
The State of Montana explicitly prohibits same-sex marriage. By conditioning receipt of critical employment benefits on solemnized or common-law marriage while denying lesbians and gay men the right to marry, Defendants deprive Plaintiffs of their fundamental rights under the Montana Constitution.
Complaint, ¶ 3 (emphasis added). Appellants’ claims are constitutional challenges. However, the Court has ignored those pled claims and generated an alternative rationale on its own. This creates an unfairness in the proceeding for the Respondents, who had no opportunity to defend against the defects in its Affidavit process which are asserted by the Court.
¶114 The Court responds to this issue by stating: “The dissent contends that we have decided this case on a theory or issue that was not argued or raised by the parties. This is simply not true. The Appellants squarely argued in their brief....” See ¶ 30. Unfortunately, the Court misunderstands the nature of this issue. I agree with the Court that Appellants raised the issue of the validity of the common-law Affidavit in their brief filed before this Court. However, that is not the problem. The problem is that Appellants did not raise this claim in the District Court, the District Court did not consider or rule upon such claim, and therefore, Appellants are not permitted to raise a new argument on appeal. Allowing Appellants to do so grants them favorable treatment not granted to any other litigant before this Court.
¶ 115 This is confirmed by a review of the Appellants’ Complaint and the District Court record. The Complaint states:
*182 53. Opposite-sex domestic partners who have not obtained a solemnized marriage may obtain access to such benefits by signing an affidavit of common-law marriage.
57. A solemnized marriage between persons of the same sex is prohibited. Mont. Code. Ann. § 40-1-401.
58. Likewise, common-law marriage between persons of the same sex is prohibited. Mont. Code Ann. § 40-1-401.
59. Montana law prohibits the Plaintiff couples from entering into either solemnized or common-law marriage.
60. For an employee’s domestic partner to qualify as a “dependent” under Defendants’ interpretation and administration of applicable state statutes and regulations, or, in the alternative, under those statutes and regulations themselves, the employee and his or her partner must enter into a solemnized marriage or sign an affidavit of common-law marriage.
61. Gay and lesbian employees are not permitted to obtain coverage for their same-sex domestic partners because Defendants intentionally condition the receipt of such benefits on marriage while denying lesbians and gay men the right to marry.
(Emphasis added.) As can be seen, the Complaint’s allegations clearly challenged the University’s policy of conditioning benefits based upon marriage, either solemnization or common law. Nowhere does the Complaint allege that the Affidavit itself was insufficient to establish a common-law marriage-that is a new argument on appeal. In fact, the Complaint’s prayer requested eight specific forms of relief: all eight ask that the court declare that the marriage statutes and the University’s regulations based thereon are unconstitutional because “Defendants, or in the alternative, the governing Montana statutes and regulations, deny to unmarried employees certain employment benefits that are provided to married employees ...” Complaint, ¶ 86 (emphasis added).
¶116 Respondents, Defendants below, filed a motion to dismiss the Complaint. Because Appellants had only raised constitutional claims in their Complaint, these were the only issues discussed by Respondents in their motion to dismiss and supporting brief:
The gist of the Complaint is that the University System group benefits eligibility criterion for spouses of employees, based as it is on the marriage relationship as recognized in Montana law, prevents the two University employed Plaintiffs from securing coverage for their same-sex partners. . . . Plaintiffs claim that the inability of University System employees to cover their same-sex domestic partners under the group benefits plan violates four *183 different sections of the Montana Constitution.
(Emphasis added.)
¶ 117 Respondents’ motion to dismiss then discussed Appellants’ eight constitutional claims and asked the District Court to dismiss them. In response to the motion to dismiss, Appellants explained the nature of the claims they were making, reaffirming the allegations pled in their Complaint. Appellants’ brief in opposition to Respondents’ motion to dismiss stated as follows:
Like all lesbian and gay employees of the Montana University System, Plaintiffs are not permitted to purchase benefits for their same-sex partners because Defendants limit dependent benefits to legal spouses. In contrast, opposite-sex couples may obtain dependent benefits merely by signing an Affidavit of Common-Law Marriage or entering into a solemnized marriage. By conditioning receipt of critical employment benefits on solemnized or common-law marriage, Defendants discriminatorily deprive Plaintiffs of adequate and affordable insurance protection for their family members, violating their fundamental rights under the Montana Constitution.
... Defendants’ argument rests on the faulty presumption that using marriage to define eligibility for benefits makes their policy gender neutral and insulates it from equal protection review. In reality, however, Defendants’ policy classifies employees and their partners based on sex because [emphasis in original] they use “spouse,” a specifically sex-based term, to determine eligibility for benefits.
... The university could have chosen to distribute benefits using any number of guidelines .... Among these many options, the university chose marriage as the defining line. By definition, using marriage means defining eligibility for benefits in sex-based terms .... This lawsuit only asks the Court to determine whether Defendants have a compelling reason for using the sex-based definition of marriage to determine eligibility for benefits.
(Emphasis added.)
¶118 Consequently, in rendering its decision, the District Court analyzed the issues precisely as framed by the Appellants:
Plaintiffs ... contend that by conditioning receipt of health insurance on marriage, while denying lesbians and gay men the right to marry, Defendants are depriving them of their fundamental rights under the Montana constitution. They ask for *184 a declaratory judgment that the Defendants’ interpretation and administration of the applicable state statutes and regulations violate their right to dignity, to privacy, to equal protection, to seek safety, health and happiness, and to pursue life’s basic necessities. Alternatively Plaintiffs ask the Court to declare that the statutes and the regulations violate their rights.
The District Court did not address the sufficiency of the common-law Affidavit in its order, because it was not an issue raised by the Appellants before the District Court.
¶119 Thus, as pled, argued, submitted and decided in the District Court, this case was strictly a constitutional challenge to the University’s use of marriage for benefit eligibility. Indeed, this the way the Appellants defined their own claims before the District Court: “This lawsuit only asks the Court to determine whether Defendants have a compelling reason for using the sex-based definition of marriage ....” At no time did they challenge the Affidavit process as failing to properly apply the law of common-law marriage.
¶120 Our Court does not address new arguments or changes of argument on appeal. “The rule is well established that this Court will not address an issue raised for the first time on appeal.” State v. McCaslin, 2004 MT 212, ¶ 49, 322 Mont. 350, ¶ 49, 96 P.3d 722, ¶ 49. See also State v. Bar-Jonah, 2004 MT 344, ¶ 124,324 Mont. 278, ¶ 124, 102 P.3d 1229,¶ 124; State v. Heath, 2004 MT 58, ¶ 39, 320 Mont. 211, ¶ 39, 89 P.3d 947, ¶ 39; State v. Peterson, 2002 MT 65, ¶ 24; 309 Mont. 199, ¶ 24, 44 P.3d 499, ¶ 24; State v. Weaselboy, 1999 MT 274, ¶ 16, 296 Mont. 503, ¶ 16, 989 P.2d 836, ¶ 16; State v. Lucero, 2004 MT 248, ¶ 20, 323 Mont. 42, ¶ 20, 97 P.3d 1106, ¶ 20; Ellenburg v. Chase, 2004 MT 66, ¶ 18, 320 Mont. 315, ¶ 18, 87 P.3d 473, ¶ 18; State v. Martinez, 2003 MT 65, ¶ 17, 314 Mont. 434, ¶ 17, 67 P.3d 207, ¶ 17; State v. Minez, 2003 MT 344, ¶ 19, 318 Mont. 478, ¶ 19, 82 P.3d 1, ¶ 19; Schlemmer v. N. Cent. Life Ins. Co., 2001 MT 256, ¶ 22, 307 Mont. 203, ¶ 22, 37 P.3d 63, ¶ 22; Unified Industries, Inc. v. Easley, 1998 MT 145, ¶ 15, 289 Mont. 255, ¶ 15, 961 P.2d 100, ¶ 15. As this partial list of recent cases illustrates, our rule is firm. As we reasoned in State v. Adgerson, 2003 MT 284, ¶ 12, 318 Mont. 22, ¶ 12, 78 P.3d 850, ¶ 12, “[t]he rule is well established that this Court will not address an issue raised for the first time on appeal.... A party may not raise new arguments or change its legal theory on appeal, because it is fundamentally unfair to fault the trial corut for failing to rule on an issue it was never given the opportunity to consider.” Adgerson, ¶ 12 (citations omitted). The purpose for our rule is well illustrated here, where the District Court was not presented with Appellants’ arguments.
*185 ¶121 The Court replies that Respondent University did not raise an objection to Appellants’ new argument in its brief. The Court apparently believes that, somehow, this cures the problem for which the rule exists-unfairness to the district court and disrespect for the process. The Court errs again. We have routinely and consistently applied the rale, regardless of whether the opposing party raised the issue. State v. Heath is a recent example. There we declined to address an issue the Appellant had failed to raise in the district court. Heath, ¶ 39. However, Respondent State had not raised the Appellant’s failure to raise the issue in the district court as an objection in its briefing.
¶ 122 Thus, by accepting the arguments which Appellants have raised for the first time on appeal, and incorporating them into its opinion, the Court has violated our longstanding rale and has afforded special treatment to Appellants which is not afforded to other litigants who come before this Court.
¶123 The second preliminary matter is that numerous factual assertions and assumptions offered by the Court are without evidentiary support. The District Court resolved this matter by granting the Respondents’ motion to dismiss the Appellants’ Complaint. There was no factfinding, and there is no factual record other than pleaded facts. Nonetheless, in ¶ 23, the Court states that “[presumably, a couple who declines to sign a statutory written declaration of marriage without solemnization, and instead signs the Affidavit provided by the University System, may choose not to marry at all....” However, there is no evidence that the couples who signed an Affidavit “may choose not to marry at all.” To the contrary, this statement directly conflicts with the claims in Appellants’ Complaint, quoted above, and with the University’s Affidavit of Common-Law Marriage, which states:
AFFIDAVIT OF COMMON-LAW MARRIAGE
We, the undersigned, both being over the age of 18 years, have mutually consented and contracted to become husband and wife; we are now, and have been since_(date), living together as husband and wife, and have mutually consented to hold towards each other the relationship of husband and wife, and to assume towards each other all the responsibilities and duties which the law attached to such a relationship.
The Affidavit plainly states that the couple has “mutually consented” to be husband and wife and have assumed “all the responsibilities and duties which the law attached to such relationship.” This is the factual record in this matter. It is not in our power to reject it, for there is no evidence-even more, no allegation-oi anything different. The Court *186 expresses dismay that “[t]hose opposite-sex couples who fill out the Affidavit in order to receive benefits may be shocked to think that they have in fact entered into a marriage that requires court action to dissolve ....” See ¶ 33. Whether or not they are shocked is not in the record, but more to the point, that is not the issue. For purposes of this case, they have signed an Affidavit which said that very thing: they were assuming the marital relationship with “all the responsibilities and duties which the law attached to such a relationship.” That is our record. It is unchallenged by pleading, briefing or evidence. Thus, as a factual matter, it is simply erroneous for the Court to find that any of the couples who signed the Affidavit “may choose not to marry.” Although intent is one element of common-law marriage (that is, the parties’ mutual consent, discussed herein), the pleadings and the Affidavit clearly establish the couples’ mutual consent to their common-law marital relationship.[11]
¶124 On that factually-flawed premise, the Court then finds that such a policy “allows unmarried opposite-sex couples to sign an Affidavit.” See ¶ 24. This conclusion is also factually flawed because the University’s policy allows no such thing. To the contrary, the policy allows only married opposite-sex couples to obtain marital health benefits, including those opposite-sex couples who are married under the common law. The University’s policy requires these couples to sign the Affidavit attesting to their marital relationship. Likewise, the pleadings illustrate the Court’s clear error in stating that marital status “plays little if any role in determining who is eligible for benefits.” See ¶ 26. Again, to the contrary, marital status is the exclusive factor in determining partner benefits under the University’s policy.
¶125 Therefore, the Court has decided this matter on a basis which, I respectfully submit, is both procedurally and factually flawed. That notwithstanding, I turn to an analysis of the substance of the rationale regarding common-law marriage proffered by the Court, before turning to the issues pled by the Appellants.
¶126 The Court’s holding, which invalidates the common-law marriage claims of the couples who signed the Affidavit, is premised upon several policy observations and legal propositions which are either unsupported with authority, or which cite to authority which is *187 inapposite. First, in ¶ 24, the Court offers an entirely new definition of common-law marriage, without citation to authority, as “an equitable doctrine used to ensure people are treated fairly once a relationship ends.” Second, the Comb offers an entirely new rationale for common-law marriage, again without citation to authority except for a unspecified reference to our “typical cases,” as a concept “designed, in part, to prevent an unjust economic harm to couples who have held themselves out as husband and wife....” Thirdly, the Court opines, with no reference to authority whatsoever, that “[a]t the very least ... common law marriages are not automatically recognized by signing [an] Affidavit.” The Court then concludes that a common-law marriage cannot be established “prospectively.” I respectfully submit that, in my opinion, none of these propositions comport with Montana law.
¶127 I concur with the Court’s citation to Ober and Hunsaker for the three elements of a common-law marriage which must be proven under our law — a couple’s competency, consent and confirmation. Regarding these elements, the party asserting that a common-law marriage exists has the burden of proving all three elements. Hunsaker, ¶ 32 (citing Matter of Estate of Vandenhook (1993), 259 Mont. 201, 204, 855 P.2d 518, 520). However, “public policy, as well as statutory law, favors the finding of a valid marriage.” Ober, ¶ 16. Further, the burden of proof is made lighter by § 26-1-602(30), MCA, which establishes a presumption that “[a] man and woman deporting themselves as husband and wife have entered into a lawful contract of marriage.” Although a disputable presumption, we have held in the common-law marriage context that “the presumption in favor of matrimony is one of the strongest known to the law and that every intendment of the law is in favor of matrimony . . . .” Estate of Murnion (1984), 212 Mont. 107, 113, 686 P.2d 893, 897. Indeed, this statutory presumption is “itself sufficient to establish the marriage unless overcome by other evidence.” Spradlin v. United States (D. Mont. 1967), 262 F.Supp. 502, 505. “The effect of [the marital] presumption, of course, is to place the burden on the other party to overcome the presumption.” Murnion, 212 Mont. at 113, 686 P.2d at 897.
¶128 Thus, the language of the Affidavit and the law’s presumption in favor of marriage clearly establish a prima facie claim of common-law marriage because the presumption is “itself sufficient to establish the marriage.” Spradlin, 262 F.Supp. at 505. Consequently, the University acted properly under the law in recognizing the marriages based upon the Affidavit. Further, the pleadings did not challenge the marriage claims of couples signing the Affidavit, and therefore, there can be no argument that Appellants carried a burden to “overcome the *188 presumption” that lies in favor of the couples’ claims. Murnion, 212 Mont, at 113, 686 P.2d at 897. Therefore, as a matter of proof (here, within the context of pleaded facts), the couples’ claims of common-law marriage have undeniably been established under Montana law.
¶129 For this reason, the Court’s reliance on Estate of McClelland, simply because the evidence in that case included an affidavit, is incorrect. In McClelland, the parties’ affidavit was but one piece of the “extensive evidence presented by both sides as to the existence or nonexistence of the common law marriage” at issue. McClelland, 168 Mont. at 162, 541 P.2d at 781-82. This Court decided that case, not on the sufficiency of the affidavit, but because:
the facts establishing the common law marriage of appellant and deceased are conflicting. This Court has consistently held that where there is a conflict in the evidence, the findings of the trial court are presumed to be correct if supported by evidence most favorable to the prevailing party.
McClelland, 168 Mont. at 165, 541 P.2d at 783. In its citation to McClelland, the Court mentions neither the other “extensive evidence” introduced in that case nor the basis for the McClelland court’s decision. In regard to the sufficiency of proof, McClelland is completely irrelevant because, in this case, there are no pleaded facts which rebut the Affidavit and legal presumption in favor of marriage.[12]
¶130 The Court then states, without citation to any case, that “[o]ur case law consistently holds that one of the parties to the relationship must assert, through extrinsic evidence, that all of the common law marriage elements were met....” See ¶ 33. The Court reiterates that it is “not aware” of any Montana case in which a common-law marriage was established without “extrinsic evidence.” This statement is erroneous, both as a matter of law and of fact, as demonstrated by the record in this case.
¶131 First, the law. Contrary to the Court’s new requirement of “extrinsic evidence,” we have held that “[t]he mutual consent, of the parties [for a common-law marriage] does not need to be expressed in any particular form.” Hunsaker, ¶ 34 (citing In re Estate of Slavens (1973), 162 Mont. 123, 126, 509 P.2d 293, 295). Thus, the Court errs in *189 asserting that our law “clearly defines” what kind of evidence is necessary to establish a common-law marriage. See ¶ 33. To the contrary, we have allowed parties to demonstrate a common-law marriage by whatever form they are able.
¶132 Further, the Court ignores the presumption which the law imposes in favor of a marriage and the impact it has on evidentiary questions. In Spradlin, the Appeals Council of the Social Security Administration had concluded there was “no evidence” presented in support of the elements of a common-law marriage, and ruled against the party claiming the marriage. Spradlin, 262 F.Supp. at 504-05. The United States District Court reversed, concluding that the decision of the Appeals Council was contrary to Montana law, and explaining the nature of Montana’s statutory presumption on questions of proof:
The [statutory] presumption itself was proof of a marriage, ceremonial or common-law.... If there was no ceremonial marriage, the presumption would be sufficient to establish both the capacity of the parties and the consent of the parties for the purposes of the common-law marriage. The statute creating the presumption, by the use of the words “lawful contract” embraces both the fact of the consent and the capacity to consent. ... [T]he presumption of marriage should be weighed on the one side and on the other side [contrary evidence] should be weighed .... [H]owever, there is no requirement in the law that the capacity to marry should be conclusively established. The statutory presumption was itself sufficient to establish the marriage unless overcome by other evidence.
Spradlin, 262 F.Supp. at 505. Thus, the statutory presumption alone is sufficient evidence to establish a common-law marriage-there is no other “extrinsic evidence” requirement in the law.
¶133 The Court’s error is further demonstrated by the practical realities of proving a common-law marriage. State, federal and private agencies routinely recognize common-law marriages by administrative declaration, and pay financial benefits based upon that administrative action. By law and by contract, these agencies defer to the law of the applicant’s domiciliary state in regard to the validity and establishment of a common-law marriage. This is particularly true of federal law governing eligibility for various federal benefits. “In deciding who is entitled to federal survivor benefits, [the United States Office of Personnel Management] looks to state common law to define marriage and to determine who is the legal widow ....” Huff v. Director, United States Office of Pers. Mgmt. (3rd Cir. 1994), 40 F.3d 35, 39 (citing 5 C.F.R. § 831.603). In LaRochelle v. Office of Pers. Mgmt. (Fed. Cir. *190 1985), 774 F.2d 1079, LaRochelle claimed to be a common-law spouse who was entitled to benefits. The court stated:
Texas, the state of the LaRochelles’ domicile, recognizes common-law marriages. Tex.Fam.Code Ann. § 1.91(a)(2) (Vernon 1975). Because [the Office of Personnel Management] will consult state law where federal law is not determinative, this type of marriage satisfies the survivor annuity provisions.
LaRochelle, 774 F.2d at 1080. The common-law marriage determination is an agency decision that does not require court involvement, unless a party seeks judicial review of the agency decision, see Slate v. OPM (1982), 10 M.S.P.R. 658, and Goldbach v. OPM (1989), 42 M.S.P.R. 57, but which carefully applies the particular requirements of the law in the applicant’s jurisdiction. See Gainey v. Barnhart (8th Cir. 2002), 299 F.3d 1004, 1006-07, and McKenzie v. Harris (3rd Cir. 1982), 679 F.2d 8, 10-13 (analyzing elements and proof necessary under Michigan and Pennsylvania law, respectively, for determination of common-law marriage for purposes of Social Security benefits). An applicant from a state which does not recognize common-law marriages cannot qualify for benefits by claiming to be married under the common law. See Howard v. Keohane (E.D. Ky. 1995), 898 F.Supp. 459, 462-63 (marriage claim could not be maintained under Louisiana law, which did not recognize common-law marriages). Thus, if state law denies common-law marriages without a court order, that requirement will be enforced by the agencies applying the state law to determine eligibility.
¶134 Administrative determination of common-law marriage based upon the law of the applicant’s domicile occurs in a variety of other public and private benefit contexts as well, including Social Security, 20 C.F.R. § 404.344; ERISA plans, Iron Workers Mid-South Pension Fund v. Stoll (E.D. La. 1991), 771 F.Supp. 781, 783-84; Longshoremen’s and Harbor Workers’ Compensation Act benefits, Marcus v. Office of Workers’ Compensation (D.C. Cir. 1976), 548 F.2d 1044, 1047 (citing 33 U.S.C. § 902(16)); trade union trust plans, Int’l Painters & Allied Trades Indus. Pension Fund v. Calabro (E.D. Pa. 2004), 312 F.Supp.2d 697, 701-02; Department of Defense benefits, DOD Military Pay and Allowances Entitlements Manual, Rules for Determining Relationship and Dependency, ¶ 30233, Validity of Member’s Marriage; and property and casualty coverage, National Sec. Fire & Cas. Co. v. Minchew (Ala. 1979), 372 So.2d 327. This is only a partial list. It has been said that marriage is “ ‘a unique gateway’ to hundreds of rights under state law and over 1,000 under federal law ....” Same-Sex Marriage, Duke Law Magazine, Fall 2004, p. 6. Under 5 C.F.R. § 831.603, which governs federal personnel plans, “[m]arriage means a marriage recognized in *191 law or equity under the whole law of the jurisdiction ... of the employee.”
¶135 Thus, administrative declarations of common-law marriage occur daily. Regarding necessary proof, the Social Security Administration, for example, will grant marital benefits under Montana law upon less convincing evidence than the University’s Affidavit:
(b) Preferred evidence. Preferred evidence of a common-law marriage is-
(1) If both the husband and wife are alive, their signed statements and those of two blood relatives;
(c) Other evidence of common-law marriage. If you cannot get preferred evidence of a common-law marriage, we will ask you to explain why and to give us other convincing evidence of the marriage. We may not ask you for statements from a blood relative or other person if we believe other evidence presented to us proves the common-law marriage.
20 C.F.R. § 404.726(b)(1) and (c).
¶136 Thus, it can be seen that the Court’s new "extrinsic evidence” requirement, for which it can cite no authority, is not only inconsistent with our law, but, as a practical matter, will interfere with efforts of various agencies, applying Montana law, to make common-law marriage determinations.
¶137 Secondly, the Court is wrong on the “facts” of the matter. Even if it was appropriate to impose a new “extrinsic evidence” requirement, such evidence has been provided in this case. The Court belittles the University’s Affidavit process as simply “signing a piece of paper.”[13] See ¶ 32. As a matter of evidence, however, it is uncontested that the couples who have signed the Affidavit have lived together since a past date, have consented and contracted to be husband and wife, are currently living together, and have assumed all responsibilities and duties under the law related to the marital relationship. This “extrinsic evidence” about their relationship has not been contested, and therefore, they have established a common-law marriage as a matter of fact under the record in this case. The Court is simply closing its eyes to the pled, uncontested facts here.
¶ 138 The Court next faults the University’s Affidavit process because “no jurisdiction permits a statement of future intent to create a common *192 law marriage” and because “[w]e are aware of no Montana case in which a common law marriage was established prospectively.” See ¶ 24. There are no such Montana cases because that is not the law. “The party asserting the existence of a common-law marriage must... prove that the three elements of common-law marriage all existed at one time.” Hunsaker, ¶ 43 (emphasis added). The law of common-law marriage does not recognize an element that is to occur in the future; all the elements must occur together. The elements of a common-law marriage “must take place at a set time.” Hunsaker, ¶ 43. However, this issue is a red herring, because there is no attempt here to prove the marriage prospectively. Rather, the Affidavit is evidence of both past intention and action (stating that the couple has previously mutually consented to be husband and wife, and have been living together and holding toward each other as husband and wife since a past date) and a present action and intention (stating the couple is now mutually consenting to be husband and wife, and is now living together and holding toward each other as husband and wife). No future intent is involved here.
¶139 The Court then attempts, without citation to authority, to explain that the application of the common-law marriage doctrine is limited to only those situations arising “after the death of one of the parties or separation of the relationship.” See ¶ 24. This is simply inaccurate. This Court, like other courts around the country, has addressed common-law marriage in many contexts, including those in which both parties are alive and the relationship is continuing. See State v. Baldwin, 2003 MT 346, ¶ 37, 318 Mont. 489, ¶ 37, 81 P.3d 488, ¶ 37 (defendant seeking application of spousal privilege); Howard (couple seeking marital communication rights within prison); Scott v. Bd. of Trustees of Mobile S.S. (Ala.1988), 540 So.2d 657, 658 (couple seeking spousal welfare benefits); National Sec. Fire & Cas. Co. (couple seeking to establish insurable property interest by marriage). The Court cites no authority for its new rule limiting common-law marriage claims to post-death and post-relationship situations.
¶140 The Court then reasons that common-law marriage is an equitable doctrine “used to ensure people are treated fairly once a relationship ends.” ¶ 24. I would agree that Montana law protects people once a relationship ends, but not by a parsing of the common law doctrine. Rather, that is done by statute, which provides as follows:
40-1-403. Validity of common-law marriage. Common-law marriages are not invalidated by this chapter.
40-1-404. Putative spouse. Any person who has cohabited *193 with another to whom he is not legally married in the good faith belief that he was married to that person is a putative spouse until knowledge of the fact that he is not legally married terminates his status and prevents acquisition of further rights. A putative spouse acquires the rights conferred upon a legal spouse, including the right to maintenance following termination of his status ....
[Emphasis added.]
We have held that “[t]he rights of putative spouses are protected in Section 40-1-404, MCA, where any person has cohabited with another to whom he is not legally married in the good faith belief that he was married.” Murnion, 212 Mont. at 118, 686 P.2d at 899 (emphasis added). This provision specifically grants all rights of a legal spouse to a person who cohabited with another in the good faith belief they were married. Thus, it is not the common-law marriage doctrine which primarily protects a person following the end of the relationship. Indeed, a person is protected by this statute even if his or her claim of common-law marriage fails.
¶141 Finally, the Court asserts that should the couples who have signed the Affidavit wish to assure their marital status, there is “no need to resort to the ‘common law’ since Montana statutory law provides for a written declaration of marriage without solemnization and they may avail themselves of this informal statutory process as provided by the Legislature in § 40-1-311, MCA.” ¶ 34. The Court’s premise is that there can be no common-law marriage here because there is no common law where the law is declared by statute, and thus, common-law marriage has been abrogated under these circumstances by operation of the statutes which provide for a written declaration of marriage. The Court errs here in two ways.
¶142 First, § 40-1-403, MCA, declares that “common-law marriages are not invalidated by this chapter.” In other words, the Legislature has specifically provided that nothing in the marriage statutes governing solemnization or declaration has done anything to affect the validity of common-law marriages. Thus, the marriage statutes which provide for other ways of marrying have not invalidated the law of common-law marriage for any circumstances, including those here. The Court can cite to no authority for its assertion to the contrary.
¶ 143 Likewise, the Court errs by concluding that “there is no need to resort to the ‘common law’ ” because the couples could have used a written declaration of marriage without solemnization to establish their marriage. I do not disagree that marriage by declaration may also have *194 worked and may even have been preferable.[14] However, the failure to use a statutory marriage option, even one that may have been better under the circumstances, does not invalidate all other avenues which the law provides for marriage.
¶144 A summary of the Court’s various holdings here reveals the dramatic nature of the changes it has made to the substantive law of common-law marriage, beyond its procedural actions of entertaining new arguments on appeal. First, the Court has imposed, without citation to any case, the new requirement of “extrinsic evidence,” see ¶¶ 24, 33, and holds that an affidavit is insufficient, though both of these principles are inconsistent with our law providing that proof need not “be expressed in any particular form.” Hunsaker, ¶ 34. The Court overrules the law governing the marriage presumption, which, prior to this decision, “was itself sufficient to establish the marriage unless overcome by other evidence.” Spradlin, 262 F.Supp. at 505. Although that presumption formerly held a position as “the strongest known to the law,” Murnion, 212 Mont. at 113, 686 P.2d at 897, the Court’s decision reduces it to nothing. The Court then prohibits, without citation to authority, claims to common-law marriage claims which it defines as “prospective.” See ¶¶ 24, 33. Although the evidence in this case demonstrates past and present actions of the couples, and therefore, the “prospective” rule is inapplicable here, this is, nonetheless, a limitation in the law of common-law marriage never before recognized. Then, in a dramatic holding, the Court prohibits common-law marriages in those situations in which the couples could have been married using a statutorily authorized method of marriage. See ¶ 34. Pursuant thereto, the Court directs federal, state and private agencies to use only the provisions of § 40-1-311, MCA, when seeking to recognize marriages, prohibiting them from considering marriage under the common law. See ¶ 36. This is accomplished without citation to a single Montana case which would support any of these holdings.
¶145 Despite all of this, the Court proclaims that its opinion simply “reaffirms existing common law marriage jurisprudence.” See ¶ 35. Reaching the dewpoint of duplicity, the Court then offers that “[w]e haven’t changed anything.” See ¶ 35. To the contrary, and as illustrated by the preceding paragraph, the Court has changed just about everything in regard to the law of common-law marriage and its *195 application.
¶146 I submit, respectfully, that every piece of the rationale offered by the Court in support of its holding is inconsistent with the law. There is no basis to invalidate the University’s policy of granting marital benefits for those couples who are common-law married. The policy is fully justified under the law, both by proof and by process. Having so concluded, I turn to the issues actually pled by the Appellants in the District Court.
¶147 Appellants claim that the University’s policy of conditioning benefits upon marriage violates equal protection by impermissibly discriminating on the basis of sex, sexual orientation, and marital status, and further, that the policy’s reliance upon marriage violates their fundamental rights under the Montana Constitution, particularly, the right to dignity. Here, an important distinction must be made.
¶148 The Court states that this case is “not about” a challenge to Montana’s marriage laws, noting that Appellants have not asked us to address the question of whether Montana’s marriage statutes discriminate against same-sex couples. See ¶ 13. This is true in the technical sense, but, without more, gives an incomplete picture about this case. The Court is correct that Appellants are not asking in this case for the right to marry. However, they are challenging the policy of granting partner benefits on the basis of marriage. In other words, Appellants, as unmarried same-sex couples, claim entitlement to the same benefits that are granted to married couples, arguing that the University’s policy of relying on marriage is impermissible discrimination. Thus, Appellants are challenging the right of government (and by extension, any entity) to define eligibility for benefits by reliance on the law’s recognition of legal marriage. If they prevail, defining eligibility for benefits for partners on the basis of marriage would no longer be permissible vis-a-vis unmarried couples. In this context, marriage would be rendered simply a societal option without exclusive legal significance. More accurately then, this case “is about” the legal status of marriage in our society, specifically, whether the law still recognizes marriage as the transcendent societal relationship upon which government may base its decisions.
¶149 Similarly, in my view, the concurrence mis-frames the issue before the Court. It states that “this is not a gay marriage case. This case is about providing equal financial benefits to similarly situated employees of the same employer.” See ¶ 105.1 agree that this case is not about gay marriage. Rather, it is about legal, heterosexual marriage and its status under the law. The equal protection premise considered by the concurrence is that “heterosexual couples are entitled to more *196 and better employment benefits than are homosexual couples,” from which it concludes that this unequal treatment violates constitutional principle. See ¶ 87. That the concurrence has incorrectly analyzed this case as merely one about the treatment of heterosexual couples versus homosexual couples is apparent, not only from a review of the pled facts and the issues raised, but also from the logical outcome of its reasoning: unmarried heterosexual couples would be also entitled to partner benefits. In other words, the concurrence would require that all couples be equally treated, without regard to sex or marital status. Therefore, at its core, the concurrence’s analysis is flawed because it fails to consider that the heterosexual couples here are married, whether by solemnization, declaration, or common law, and then fails to consider whether the University’s reliance upon marriage is lawful in light of the Appellants’ challenges.[15] Thus, neither the Court nor the concurrence has addressed the essential issue raised by the challenge: the legal status and effect of marriage.
¶ 150 Marriage between a man and a woman is based upon thousands of years of cultural experience. Its legal status is founded upon hundreds of years of legal precedent. We have stated that “[u]pon [marriage] depends the home, upon the preservation of which, in turn, depends good citizenship and the permanency of a republican form of government. The state therefore favors the institution of marriage.” Franklin v. Franklin (1910), 40 Mont. 348, 350, 106 P. 353, 354. The United States Supreme Court has held:
It is also to be observed that, whilst marriage is often termed by text writers and in decisions of courts a civil contract-generally to indicate that it must be founded upon the agreement of the parties, and does not require any religious ceremony for its solemnization — it is something more than a mere contract. ... It is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress.
Maynard v. Hill (1888), 125 U.S. 190, 210-11, 8 S.Ct. 723, 729, 31 L.Ed. 654, 659.
*197 ¶151 Given the status of marriage, it is hardly surprising that, as Respondent notes, courts on a national scale have routinely rejected constitutional challenges to state law limiting marriage to opposite-sex couples and have denied claims of same-sex couples to the benefits available to married couples. These cases recognize generally that the claims to unequal treatment cannot prevail against the simple, yet profound principle that marriage between a man and woman is fundamental to our society, that the state has a legitimate interest in promoting marriage, and that this relationship cannot be approximated, copied or equaled by any other without the collective will and action of the people. As stated by the Wisconsin Court of Appeals:
[W]hether to allow extension of state employee health insurance benefits to companions of unmarried state employees of whatever gender or sexual orientation-is a legislative decision, not one for the courts. Indeed, the point is well made in the brief of the American Civil Liberties Union Foundation and the American Civil Liberties Union of Wisconsin Foundation, as amici curiae, when, urging us to rule that state insurance coverage be extended to employees’ companions, they suggest that we can ensure responsible administration of such a program by “creat[ing] a scheme” to ensure that benefits are extended only to same-sex couples with adequate “indicia of commitment” to each other-or a “registration scheme” that “is enforceable and guards against fraud.”
“Creation” of verification and registration systems designed to facilitate the extension of state employee benefits to the employees’ unmarried companions-and an enforcement mechanism to ensure that only stable and committed same-sex couples are eligible for such benefits-is precisely the type of action committed to the legislature, as the policymaking branch of government. It is beyond all powers of this or any other court.
Phillips v. Wisconsin Pers. Com’n (Wis. Ct. App. 1992), 482 N.W.2d 121, 124 n.l (emphasis added).
¶152 Appellants contend that the University’s policy discriminates on the basis of marital status because it cannot be demonstrated that the policy “was rationally selected to advance an independent, legitimate governmental purpose.” However, the legitimate purpose is to provide benefits to the partners of University employees. As demonstrated by the above quote from Phillips, the use of marriage to define partner eligibility creates certainty and practicality in administration of a large benefit program because it incorporates existing state law regarding family relationships. As a matter of law, *198 married couples are engaged in a permanent relationship because the relationship cannot be terminated except by operation of law. Thus, there is a legally presumptive stability that attends to the marital relationship that does not exist in other relationships, an important consideration in the administration of health plans. Further, the policy is “rationally related to a legitimate state purpose, the state’s interest in promoting marriage.” Hinman v. Dep’t of Pers. Admin. (Cal. Ct. App. 1985), 167 Cal.App.3d 516, 523 (denying claim for dental benefits for same sex partners of state employees).
¶153 Appellants contend that the University’s reliance on marriage is sex-based discrimination because the policy “den[ies] dependent benefits to a female employee with a female partner while offering them to a male employee with a female partner.” However, the policy itself rests upon state law which limits marriage to male-female couples, and which, with the passage of CI-96 on November 2, 2004, immediately effective, is constitutionally established. The law is not sex-based, but facially neutral, because it prohibits both men and women from marrying a person of the same sex. To the extent it could still be argued that the law is sex-based because it prohibits marriage based upon one’s sex, that classification is, nonetheless, now constitutionally sanctioned.
¶154 Appellants further contend that the University’s policy discriminates on the basis of sexual orientation. There is a dearth of authority that sexual orientation is a suspect class for equal protection purposes, but further, and again, the policy is based upon state law defining marriage as between a man and a woman. The marital relationship between a man and a woman is now a constitutionally-protected classification. The University’s policy is consistent with that constitutional classification and therefore, the government’s reliance on that classification cannot result in unlawful discrimination. While these claims may neither have prevailed prior to the passage of CI-96 either, those arguments are now moot and need not be addressed.
¶155 Lastly, the Appellants claim the University’s policy violates their fundamental constitutional rights, particularly, the right to dignity. The concurrence accepts the Appellants’ argument, and concludes that the University’s policy should be invalidated by application of the dignity provision. See ¶ 97. I thus turn to this final claim.
¶156 I would note at this juncture that I respect the personal concern that drives the concurrence. I would not question the author’s sincerity nor his desire to render decisions he believes will improve the lives of people. Thus, my disagreement with the concurrence is not with its empathy, but with its legal analysis.
*199 ¶157 The concurrence would hold that “[hjuman dignity may not be violated-no exceptions.” See ¶ 77. It suggests that various principles emanate from the Constitution’s dignity provision that this Court should encase as law. While admirable in thought, such an expansive reading and rendering of the dignity provision would easily subsume concrete constitutional principles. There is nothing within constitutional jurisprudence, for example, of equal protection, due process or cruel and unusual punishment, that would not be superseded by the mandate that all people be treated with “dignity.” Indeed, the offered model purports “to declare one way in which human dignity can be violated-by denying someone the equal protection of the law based on some sort of arbitrary classification ....” See ¶ 72. Thus, instead of a constitution embodying numerous principles interpreted and understood in accordance with their respective jurisprudence, ultimately we would have a constitution embodying a single, overriding and encompassing principle-dignity.
¶ 158 Of course, dignity undergirds the Constitution and is part of the philosophical foundation of our Constitution. We would desire that all would be treated with dignity and work toward such end under the law, but that is something far different than interpreting the law to require all outcomes be consistent with dignity-whatever that would mean, and that is the problem. Elevating the dignity provision to such a place would inevitably require that a judges’ subjective feelings about how a person should be treated be enshrined as law, and that without limits, because “human dignity may not be violated-no exceptions.” The concurrence itself is illustrative of this concern.
¶159 The concurrence reaches its implied conclusion-that marriage can no longer be used as a basis for governmental decision and action — without any evidence. This is an appeal from the granting of a motion to dismiss, and there are no facts of record beyond those asserted in the pleadings. Instead, the concurrence is fueled by sociological research. While research is important and is occasionally referenced in court opinions, it is notable here that none of the sociological information relied upon by the concurrence was introduced as part of the District Court record, and thus, no opportunity to rebut or defend those assertions was ever given to the Respondents. Evidence is not critical in order for judges to decide cases on the basis of their personal concept of dignity.
¶160 The concurrence’s analysis of the dignity provision is comprehensive. The Constitution’s language and history is finely combed. However, not a single word can be found therein which would give even a clue that the dignity provision was intended by the *200 constitutional convention delegates, or could be extrapolated, to reorder the exclusive nature of marriage or otherwise expand marital or related rights to those who did not have them at the time the Constitution was adopted. The concurrence asserts such rights are included with those “retained by the people.” However, the rights which the concurrence would grant had not been granted anywhere in the country at the time of the Constitution’s adoption. Discussion about such a fundamental altering of society cannot be found or implied in our constitutional history. Would anyone deny, that had Montanans been advised that the word “dignity” in our Constitution could be interpreted by judges as legitimizing or benefitting homosexual relationships, the Constitution would never have been approved in 1972? Would anyone disagree with the same proposition concerning an election today? No one would, because it cannot be denied. Thus, the very document which sets forth the word “dignity” would not exist under philosophical assumptions offered by the concurrence.
¶161 This underscores the authority that judges would need to take to themselves in order to do what the concurrence suggests. It would require judges to read into the Constitution, either in a manner never contemplated by the people, or, as illustrated by the passage of CI-96, directly opposed by the people. To undertake such power would require judges to deny the rights of the people which are more fundamental than the right to dignity: the right of the people to define their society and to govern themselves. Although the concurrence calls up Madison’s “tyranny of the majority,” rendering the conclusion it advocates would require judges to act as a “tyranny of the few,” depriving the people of their sovereign rights:
What goes on in other people’s bedrooms is a question that has intrigued me since reaching puberty, but it is none of my business. I thus find it distasteful to uphold the denial of health insurance to the dependents of a deserving segment of the workforce merely because of their sexual predilections.
... [However, w]e must take care not to read the constitution to embrace subjects never thought to be within its reach. The more the state constitution is found to be intolerant of disagreement, the deadlier becomes the grip upon the people’s inventiveness.
The most cherished principle in our system is that government rests on the consent of the governed. The central idea is that in the meandering course of history, there is time for vision and revisions-for mistakes to be made by the people and rectified by the people. Democracy has its price. ... But, surely, the judiciary *201 does not have a monopoly on justice. Appellants must seek redress in another forum.
Rutgers Council of AAUP v. Rutgers State Univ. (N. J. Super. 1997), 689 A.2d 828, 838-39 (J.A.D. Baime, concurring).
¶162 The concurrence taunts the will of the people with repeated criticisms of majoritarian morality. It is this very “majoritarian morality” that has placed into law those principles upon which society rests. By law, “we the people” feed the hungry, care for the sick, build schools and hospitals, educate the population, protect workers’ safety and wages, define and prosecute crime, punish the criminal without cruelty, defend the country, rescue the abused child, and recompense for damages inflicted, to name a few. Without majoritarian morality, we would not be having this discussion today, because a civil society would not exist. For that reason it is incorrect to define this issue as a violation of liberty. Liberty is not a license to do what is right in one’s own eyes. That is anarchy. Liberty in a free society is the right to pursue one’s own life within the solemn principles that “we the people” have established for governance of the society. As the delegates stated, referenced within the concurrence’s quote in ¶ 54, “the guidelines and protections for the exercise of liberty in a free society come not from government but from the people who create the government.”
¶ 163 The Montana Constitution’s opening phrase of “We the people” mirrors the words of the United States Constitution. “The United States was then the only country in the world with a government founded explicitly on the consent of its people, given in a distinct and identifiable act, and the people who gave that consent were intensely, profoundly conscious of the fact.” Larry D. Kramer, The People Themselves (2004), p. 5, Oxford University Press. The phrase means many things obvious, but more than the obvious is revealed when the history of the phrase is studied carefully. Included therein are deep feelings about the nature of the Constitution, and the people’s role in its application:
It means refusing to be deflected by arguments that constitutional law is too complex or difficult for ordinary citizens. Constitutional law is indeed complex, for legitimating judicial authority has offered an excuse to emphasize technical requirements of precedent and legal argument that necessarily complicated matters. But this complexity was created by the [United States Supreme] Court for the Court and is itself a product of judicializing constitutional law. In reclaiming the Constitution, we reclaim the Constitution’s legacy as, in Franklin D. Roosevelt’s words, “a layman’s instrument of government” and not “a lawyer’s contract.” Above *202 all, it means insisting that the Supreme Court is our servant and not our master: a servant whose seriousness and knowledge deserves much deference, but who is ultimately supposed to yield to our judgments about what the Constitution means and not the reverse. The Supreme Court is not the highest authority in the land on constitutional law. We are.
Kramer, The People Themselves, p. 248.
¶164 “We the people” in the Preamble to the Montana Constitution means that the Constitution is the people’s — its creation, its adoption, its interpretation-and further means that it is the people who determine how their state shall be governed. It does not mean ‘We the judges.”
¶165 I would affirm the District Court.
JUSTICE WARNER joins in the foregoing dissent of JUSTICE RICE.

 I would offer an apology to any couple who may be offended by the Court’s description of them as perhaps “choosling] not to marry at all” or as having only “a fleeting relationship.” See ¶ 23. Although there is no evidence in the record to support these statements, I am sure it was not the Court’s intention to offend.

 For a case which illustrates the minimum proof necessary to establish a common-law marriage, see Matter of Estate of Alcorn (1994), 263 Mont. 353, 868 P.2d 629, where we upheld a marriage claim based upon a horseshoe-shaped ring, a horseshoe design within a walkway, and one party’s sworn assertion that they were married. Alcorn, 263 Mont, at 357, 868 P.2d at 631. Here, superior to the proof in Alcorn, both parties have sworn to the marital relationship.

 Demonstrating a marriage by way of a “piece of paper” is hardly a novel concept. Rejecting a marriage on the basis of a “piece of paper” is.

 I fail to see, however, how couples signing a declaration of marriage would be any less “shocked” to discover they were married than couples who signed a declaration of common-law marriage, see ¶ 33, but I will stick to the actual record in this case.

 The concurrence offers, in three paragraphs, reasons why the “preserving-the-institution-of-marriage argument fails.” See ¶ 105. The reasons offered include that (1) this is not a gay marriage case, discussed above, (2) economic and social reasons that marriage will not be harmed by giving benefits to homosexual couples, and (3) why countering social opinions should not control the outcome here. The concurrence does not, however, offer a legal analysis of the status of marriage, and whether government may lawfully continue to base decisions thereon.