05-648

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 223

STATE OF MONTANA,

       Plaintiff and Respondent,

  v.

DARRYL HAMILTON,

       Defendant and Appellant

APPEAL FROM:    District Court of the Eighth Judicial District,
                    In and For the County of Cascade, Cause No. CDC 04-244,
                    Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Chad Wright, Appellate Defender, Helena, Montana

       For Respondent:

              Mike McGrath, Attorney General; Joslyn M. Hunt, Assistant
              Attorney General, Helena, Montana

              Brant Light, County Attorney; Joel Thompson and Susan Weber,
              Deputy County Attorneys, Great Falls, Montana

Submitted on Briefs:  November 22, 2006

Decided:  September 7, 2007

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Appellant Darryl Hamilton (Hamilton) appeals from the judgment of conviction and sentence of the Eighth Judicial District Court, Cascade County, convicting him of eight counts of felony incest.   We affirm.

¶2    We consider the following issues on appeal:

¶3    (1)  Did Hamilton's trial counsel render ineffective assistance of counsel by:

   a.  Failing to deliver on the promise made in opening statements that Hamilton would testify?

   b.  Allowing an officer to testify about his tactics in interviewing Hamilton and the victim?

   c.  Telling the jury during closing argument that they "probably [did not] like" Hamilton or his trial attorney?

¶4    (2)  Did the District Court err by granting the State's request for a second psychosexual evaluation?

¶5    (3)  Did the District Court err in sentencing Hamilton for eight separate counts of incest, which were all committed with the same victim over an extended period of time?

## BACKGROUND

¶6    B.H. was born on December 27, 1989.  Hamilton married B.H.'s mother, Bobbie Hamilton (Bobbie), in 1991, becoming B.H.'s stepfather when B.H. was two years old. Hamilton and Bobbie subsequently had two children together: K.H., who was thirteen years old at the time of trial, and W.H., who was ten years old at the time of trial.  B.H. was fifteen years old when she testified at the trial that Hamilton sexually abused her

2

"many times" beginning in 1997 and ending in June 2004. Over the course of this time, Hamilton abused B.H. by looking at her genitals while he masturbated; touching and rubbing B.H.'s genitals; performing oral sex on B.H.; rubbing his private parts on B.H.'s genitals and anal area to the point of ejaculation; and performing vaginal and anal intercourse on B.H. When B.H. protested his abuse, Hamilton threatened to sexually molest B.H.'s younger sister, K.H., or B.H.'s friends.

¶7 On June 10, 2004, Bobbie suspected something was wrong with regard to Hamilton's actions towards B.H. When she asked B.H. about it, B.H. gave her mother her journal and confessed that she had been sexually abused by Hamilton. Hamilton was arrested that same day. Detective John Shaffer (Detective Shaffer) with the Great Falls Police Department interviewed B.H. about the abuse that had occurred. Hamilton was charged with eight counts of felony incest, in violation of § 45-5-507, MCA.

¶8 In January 2005, Dr. Michael J. Scolatti (Dr. Scolatti) submitted a psychological evaluation of Hamilton. Hamilton had been referred to Dr. Scolatti by the Cascade County Public Defender's Office. The evaluation addressed Hamilton's "current psychological functioning," "[t]he dynamics of the case and the exploration of issues related to true and false allegations," and Hamilton's "personality traits and dynamics in relation to current sex offender research."

¶9 A jury convicted Hamilton of eight separate counts of incest on April 20, 2005. Thereafter, Hamilton's counsel requested from Dr. Scolatti a risk assessment and tier designation for Hamilton. On May 5, 2005, Dr. Scolatti submitted his risk assessment, finding that Hamilton "could be designated a Tier 1 [Low] risk to reoffend." He also

found several factors he found "to be correlated to characteristics of sex offenders who have a lower risk to reoffend."

¶10     The State then filed a motion for an independent psychosexual evaluation on May 24, 2005, noting that Hamilton had already been evaluated by his chosen evaluator, Dr. Scolatti, but that a second, independent evaluation was necessary due to both changed circumstances and Dr. Scolatti's opinion that Hamilton could be designated a Tier 1 low risk to re-offend.  The District Court granted the State's motion, and by order dated May 25, 2005, compelled Hamilton to submit to a second, independent psychosexual evaluation.  As a result of this order, the State employed Dr. Nina Wendt (Dr. Wendt) to conduct the evaluation and provided her with all of the necessary documentation.  On June 1, 2005, Dr. Wendt traveled to the Cascade County Detention Center where she had arranged a meeting with Hamilton.  However, Hamilton refused to submit to the evaluation.  The State then filed a motion for an order compelling Hamilton to submit to the independent psychosexual evaluation, which the District Court granted.  Hamilton again refused to participate in the evaluation.  Dr. Wendt then reviewed numerous reports, statements, and records, including Dr. Scolatti's psychosexual evaluation, and concluded that Hamilton was at a Tier 2, low-moderate risk to re-offend.  Dr. Wendt noted that "[s]ince Mr. Hamilton did not actively participate in the assessment process . . . [the assessment] is limited in its ability to provide conclusive information."

¶11     The District Court sentenced Hamilton on Counts I through VII to Montana State Prison for 100 years each, and on Count VIII to Montana State Prison for twenty years,

4

with sixteen years suspended.  Counts I through VII were to run concurrently, with Count VIII to run consecutively with Counts I through VII.  Hamilton appeals.

## STANDARD OF REVIEW

¶12     This Court reviews claims of ineffective assistance of counsel *de novo*.  *State v. Morgan*, 2003 MT 193, ¶ 7, 316 Mont. 509, ¶ 7, 74 P.3d 1047, ¶ 7.   This Court reviews a criminal sentence for legality only.  *State v. Bar-Jonah*, 2004 MT 344, ¶ 115, 324 Mont. 278, ¶ 115, 102 P.3d 1229, ¶ 115.  "On sentencing questions regarding statutory interpretation, we review the trial court's interpretation of the law to determine whether it is correct."  *Bar-Jonah*, ¶ 115.  When the issue on appeal concerns whether the district court violated a defendant's constitutional rights at sentencing, this question is a matter of law which we review *de novo* to determine whether the district court's interpretation of the law is correct.  *Bar-Jonah*, ¶ 115.

## DISCUSSION

**¶13     (1)  Did Hamilton's trial counsel render ineffective assistance of counsel?**

¶14     Hamilton argues that his attorney violated his federal and state rights to the effective assistance of counsel when he: (1) failed to deliver on the promise to the jury that Hamilton himself would testify; (2) allowed a detective to testify about the veracity of Hamilton and the alleged victim; and (3) "demeaned" Hamilton and his defense counsel in closing statements.

¶15     The State argues that this Court should refuse to address Hamilton's arguments on direct appeal, as counsel's reasoning behind his statement to the jury during opening arguments, his cross-examination of Detective Shaffer, and his comment during closing

arguments are not record-based. As such, the State contends that Hamilton's arguments should be raised in a petition for postconviction relief. Alternatively, the State argues that counsel's actions did not fall below an objective standard of reasonableness, nor did any prejudice thereby result, given that: (1) the testimony counsel told the jury they would hear from Hamilton concerned the admissions he made to Detective Shaffer, and the jury heard these admissions when the detective testified; (2) Detective Shaffer did not vouch for the credibility of B.H., nor did he testify that due to Hamilton's non-verbal cues, he was thereby lying; and (3) the statements counsel made during closing argument about the jury possibly hating him and Hamilton emphasized his point that the jury could not decide the case on emotion and rather had to base its decision on the facts in evidence.

¶16 Article II, Section 24, of the Montana Constitution and the Sixth Amendment of the United States Constitution guarantee a person the right to the effective assistance of counsel. When reviewing claims of ineffective assistance of counsel, this Court uses the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). That test requires the defendant to establish that counsel's performance "fell short of the range of competence required of attorneys in criminal cases and that his counsel's deficient performance was prejudicial to his case." *State v. Hendricks*, 2003 MT 223, ¶ 6, 317 Mont. 177, ¶ 6, 75 P.3d 1268, ¶ 6. There is a strong presumption with regard to the first prong of the *Strickland* test that trial counsel's performance was based on sound trial strategy and falls within the broad range of reasonable professional conduct. *Hendricks*, ¶ 7.

6

¶17 However, before reaching the merits of an ineffective assistance claim, this Court must first determine whether the "allegations are properly before us or whether the ineffective assistance of counsel claims must be pursued in a petition for postconviction relief pursuant to § 46-21-105(2), MCA." *State v. Dyfort*, 2000 MT 338, ¶ 8, 303 Mont. 153, ¶ 8, 15 P.3d 464, ¶ 8. The general rule is:

> [W]here ineffective assistance of counsel claims are based on facts of record in the underlying case, they must be raised in the direct appeal; conversely, where the allegations of ineffective assistance of counsel cannot be documented from the record in the underlying case, those claims must be raised by petition for postconviction relief.

*Hagen v. State*, 1999 MT 8, ¶ 12, 293 Mont. 60, ¶ 12, 973 P.2d 233, ¶ 12. This Court makes a distinction between record-based and non-record-based claims of ineffective assistance of counsel. *State v. Bateman*, 2004 MT 281, ¶ 23, 323 Mont. 280, ¶ 23, 99 P.3d 656, ¶ 23. The test to determine whether an ineffective assistance claim is properly brought on direct appeal is whether the record contains the answer as to "why" counsel took, or failed to take, action in providing a defense. *State v. White*, 2001 MT 149, ¶ 20, 306 Mont. 58, ¶ 20, 30 P.3d 340, ¶ 20.

¶18 Applying the foregoing, we examine each of Hamilton's allegations in turn.

### a. Failing to deliver on the promise made in opening statements that Hamilton would testify.

¶19 Hamilton argues that failing to fulfill the promise to the jury that he would testify constitutes ineffective assistance of counsel. Defense counsel told the jury that it would hear from Hamilton himself about how some contact he had with his stepdaughter was accidental. However, when it came time for Hamilton to testify, defense counsel

7

announced, without elaboration, that Hamilton would exercise his constitutional right to remain silent. Hamilton relies on numerous federal cases as authority for his argument that an ineffective assistance claim arises when defense counsel makes promises to the jury on which the attorney cannot deliver.

¶20 The State contends that, although counsel offered that Hamilton was exercising his constitutional right to remain silent, the record is otherwise silent regarding why Hamilton did not testify and thus this argument should be raised in a petition for postconviction relief. Alternatively, the State asserts that there is a strong presumption that counsel's strategy in not having Hamilton testify was sound and fell within a broad range of reasonable professional conduct.

¶21 During settlement of jury instructions at the end of the first day of trial, the State offered its proposed instruction number fifteen, which stated:

> In deciding whether or not to testify, the Defendant may choose to rely on the state of the evidence and upon the failure, if any, of the State to prove beyond a reasonable doubt every essential element of the charge against him.

> A Defendant in a criminal trial has a constitutional right not to testify. You must not draw any inference from the fact that a Defendant does not testify. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way.

During discussion, the following exchange took place:

> [Mr. Gilligan]: 15 we'll have to hold, but I assume he's going to testify. If he testifies, it will be withdrawn.

> [The Court]: If he doesn't –

> [Mr. Gilligan]: This is the right not to testify; is that right?

8

[Mr. Thompson]: Yeah.

[Mr. Gilligan]: So if he does, I'm sure the State will withdraw it.

[Mr. Thompson]: He just told the jury [Hamilton] was going to [testify].

[Mr. Gilligan]: Yeah. I guess I'd better follow through, right.

[The Court]: Well, there's a statement he gave, though. I mean that can pass as his testimony.

[Mr. Gilligan]: Can't let that sit.

[The Court]: Well, let's say 15 is given, and we can make a further record on this if necessary then.

[Mr. Gilligan]: That's fine.

¶22 When it came time for Hamilton to testify, Mr. Gilligan stated: "Your Honor, at this time Mr. Hamilton will exercise his constitutional right to remain silent. He will not testify as [that is his] constitutional right and with that the defense rests." On Hamilton's decision not to testify, the Court gave instruction fifteen to the jury.

¶23 Upon review of the record, we do not find an explanation for Hamilton's failure to testify. Beyond the above referenced quotations, we do not know defense counsel's thinking or the strategy behind Hamilton's decision not to testify, and we cannot speculate regarding those reasons. Since the record is silent as to "why" Hamilton did not testify, we dismiss Hamilton's claim of ineffective assistance of counsel without prejudice to raising the claim in postconviction relief proceedings.

**b. Allowing an officer to testify about his tactics in interviewing Hamilton and the victim.**

9

¶24    Hamilton argues that his counsel was ineffective for not objecting to what he describes as Detective Shaffer's "unsupportable quasi-expert testimony about extracting the truth from Hamilton's stepdaughter and recognizing falsehoods from Hamilton." Hamilton contends that if his attorney had objected, then Detective Shaffer "may have indeed limited his testimony to the details of the actual interview." Hamilton asserts that his attorney "could not have had a reasonable tactical reason" for failing to object to Detective Shaffer's testimony to the actual interviews he conducted, and that his counsel was ineffective for permitting the detective to inject his quasi-scientific opinions into the results of those interviews.

¶25    The State again argues that the record is silent as to counsel's reasoning behind his cross-examination strategy of Detective Shaffer, and thus this issue cannot appropriately be raised on direct appeal. Alternatively, the State argues that the strategy did not fall below an objective standard of reasonableness, nor can Hamilton show that he was prejudiced. The State contends that Detective Shaffer did not vouch for B.H. and thus this issue is "wholly inapplicable." Furthermore, regarding Hamilton, the State alleges that Detective Shaffer only offered his observation of Hamilton's behaviors and what his training had taught him about behaviors, and he did not say that Hamilton was lying or comment on his "veracity." The State argues that, pursuant to *State v. Hendricks*, 2003 MT 223, ¶ 7, 317 Mont. 177, ¶ 7, 75 P.3d 1268, ¶ 7, "there is a strong presumption that counsel's performance was based on sound trial strategy that falls within a wide range of reasonable professional conduct."

¶26 A non-record based act or omission by counsel can include a failure to object, since "the use or non-use of objections may be purely tactical." *State v. Webster*, 2005 MT 38, ¶ 15, 326 Mont. 112, ¶ 15, 107 P.3d 500, ¶ 15. Counsel's decision regarding the timing and number of objections lies within his tactical discretion. *White*, ¶ 16. Hamilton cites to *Hagen* in support of his argument that claims of ineffective assistance for failing to object to "vouching" testimony must be raised on direct appeal. *Hagen*, ¶ 24. However, the defendant in *Hagen* argued that his trial counsel was ineffective when he *elicited* testimony from a witness on cross-examination that vouched for the character of one of the State's primary witnesses. The testimony given in that case was obviously record-based, and we concluded that since it was fully set forth in the record, it was appropriate for direct appeal. *Hagen*, ¶ 24.

¶27 Here, Hamilton is arguing that his counsel was ineffective for *not objecting* to the "vouching" testimony of Detective Shaffer, rather than eliciting record-based testimony, as in *Hagen*. The lack of objection here was an omission, or failure to act, resulting in the absence of any record-based justification, and, thus, the challenge clearly falls within the non-record-based rule. If the record does not explain why counsel failed to object, the matter is often best suited for postconviction proceedings. *See State v. St. Germain*, 2007 MT 28, 336 Mont. 17, 153 P.3d 591; *State v. Upshaw*, 2006 MT 341, 335 Mont. 162, 153 P.3d 579; *State v. Dyfort*, 2000 MT 338, 303 Mont. 153, 15 P.3d 464.

¶28 Regarding B.H.'s testimony, Detective Shaffer testified that he has training in interviewing suspects and victims alike; that when he was interviewing B.H., he tried to build a rapport with her during the first twenty minutes to get her comfortable with him;

11

and that, as with all suspects he interviews, he tried to get information from B.H. without feeding her the information. Hamilton asserts that "[i]f [his] attorney had objected, then Det. Shaffer may have indeed limited his testimony to the details of the actual interview." This argument is speculative. Further, our previous recognition of the strategical nature of objections is particularly apropos to defense counsel's decisions with regard to the testimony of a young victim. Thus, on review of the record, we conclude that it does not explain why Hamilton's counsel did not object to Detective Shaffer's testimony, and we will not speculate on those reasons. Thus, the issue should be reserved for a postconviction relief proceeding.

### c. Telling the jury during closing argument that they "probably [did not] like" Hamilton or his trial attorney.

¶29 Hamilton argues that his counsel was ineffective by telling the jury in his closing argument that they may hate him and Hamilton, but to put aside this hatred when deliberating about the case. The State contends that the record does not disclose counsel's reasoning behind his closing argument, and it should thus be deferred to postconviction relief proceedings. Alternatively, the State argues that the defense counsel was not "tearing down" Hamilton's credibility, as he asserts, but rather was merely pointing out that the jury should not and could not base its decision on emotions, and this was neither deficient nor prejudicial.

¶30 During his closing argument, Hamilton's counsel stated, in pertinent part, as follows:

> Ladies and gentlemen of the jury, I bet you don't like me. Bet you don't
> like Mr. Hamilton even more. But as the Judge has told you, this hatred

12

you might feel for Mr. Hamilton and what has happened in this case has to be taken out of your mind when you deliberate.

That is, that you have to analyze the evidence that you have heard from that witness stand and base your verdict on that evidence and whether the State has proven to your satisfaction, that is beyond a reasonable doubt, that he is guilty of these eight counts of incest.

You cannot go into that jury room and say I hate Hamilton and I hate his lawyer, let's just mark all guilty pleas and get out of here.

Based on how the State has charged this crime, what you need to do is go year to year to year, all eight years, and as to that each particular year, you have to satisfy yourself that there's been evidence presented as to this particular year that a specific act of sexual contact, as defined in your instructions, has occurred. And if you cannot find a specific act for that particular year, you have to find him not guilty in that particular year.

¶31   Hamilton contends that his counsel's "apparent strategy was for the jury to put this hatred aside and view the charges individually" and that "[t]he attorneys [sic] approach in this emotionally charged case cannot be considered a sound tactical decision." However, we cannot undertake review of the merits of an ineffective assistance claim by surmising about counsel's strategy. Because the record does not clearly reveal defense counsel's strategy in giving his closing argument, it is inappropriate for direct appeal. This issue should likewise be decided in a postconviction relief proceeding.

¶32   **2. Did the District Court err by granting the State's request for a second psychosexual evaluation?**

¶33   Hamilton argues that the District Court erred by granting the State's request for a second psychosexual evaluation. He first asserts that there was no legal grounds for the State to seek a second evaluation, as the first evaluation met the statutory requirements. Further, he asserts that his refusal to participate in the second evaluation by Dr. Wendt

13

was factored into the higher risk assessment designation; that the less favorable assessment was then cited by the District Court as a reason for imposing a 120-year sentence; and that the District Court's actions related to the second psychosexual evaluation did not protect Hamilton's right not to incriminate himself.

¶34 The State argues that Hamilton's right against self-incrimination was not implicated by Dr. Wendt's independent psychosexual evaluation. The State contends that given Hamilton's refusal to participate in Dr. Wendt's evaluation, the District Court appropriately allowed Dr. Wendt to review the numerous reports, statements, and records, including Dr. Scolatti's psychosexual evaluation, in reaching her conclusion that Hamilton was at a Tier 2, low-moderate risk to re-offend, particularly because, as Dr. Wendt explained, some of the information upon which Dr. Scolatti's opinion was based was inaccurate. Further, the District Court took both evaluations into consideration when sentencing Hamilton.

¶35 The requirement for a psychosexual evaluation is set forth and governed by statute. When a defendant has been convicted of one of an enumerated list of sexual offenses, § 46-18-111(1), MCA, requires that the pre-sentence investigation include a psychosexual evaluation and a recommendation for treatment in the least restrictive environment. Here, Hamilton's conviction of incest under § 45-5-507, MCA, triggered that requirement:

> [T]he investigation must include a psychosexual evaluation of the defendant and a recommendation as to treatment of the defendant in the least restrictive environment, considering the risk the defendant presents to the community and the defendant's needs . . . . The evaluation must be completed by a sex offender therapist who is a member of the Montana sex

14

offender treatment association or has comparable credentials acceptable to the department of labor and industry. The psychosexual evaluation must be made available to the county attorney's office, the defense attorney, the probation and parole officer, and the sentencing judge. All costs related to the evaluation must be paid by the defendant . . . .

¶36 Section 46-18-111, MCA, does not, by its plain language, provide that only one evaluator may be involved or that only one evaluation report may be issued in satisfying the psychosexual evaluation requirement, and Hamilton submits no authority indicating that the District Court may not order a second evaluation when circumstances make additional evaluation necessary or appropriate. Here, the State was concerned, first, that Dr. Scolatti's assessment had not been independently conducted, and also concerned that some of the factors relied upon by Dr. Scolatti in reaching his risk assessment had changed. Specifically, during the sentencing hearing, Dr. Wendt testified that although Dr. Scolatti reported that Hamilton did not have diverse anger problems, she had found otherwise. Also, Hamilton was no longer married, and, additionally, Dr. Wendt characterized Dr. Scolatti's "[n]o violence to the victim" factor differently in that she accounted for B.H.'s vaginal and anal injury.

¶37 Thus, we conclude, as a matter of law, based upon § 46-18-111, MCA, that a second psychosexual evaluation is not prohibited. Further, we conclude that under the circumstances, the District Court did not abuse its discretion by ordering a second evaluation because an updated evaluation based on accurate information was needed.

¶38 Neither do we find Hamilton's self-incrimination argument persuasive. He contends that the imposition of a second evaluation violated his right to remain silent because, after he refused to participate, that "refusal to participate in the second

15

evaluation was factored into the higher risk assessment designation." However, although Dr. Wendt noted in her report that Hamilton had not participated, that lack of participation was not accounted or used in her determination of Hamilton's risk level. Thus, Hamilton's self-incrimination right was not implicated in this process.

**¶39   3. Did the District Court err in sentencing Hamilton for eight separate counts of incest, which were all committed with the same victim over an extended period of time?**

¶40     Hamilton argues that the District Court erred in imposing multiple sentences because the imposition of separate sentences for "each of the arbitrarily defined counts" violates the double jeopardy provisions of Mont. Const. art. II, § 25, and § 46-11-410, MCA. Hamilton asserts that his ongoing crime of sexual assault must be considered as a single offense involving a "continuous course of conduct" for purposes of sentencing.

¶41     The State argues that the District Court's sentence of Hamilton on each count of incest did not violate the constitutional or statutory double jeopardy provision because: (1) there were separate acts for each year upon which to base a separate offense; (2) the State has charging discretion and had the burden of proving the statutory elements for each crime charged; and (3) an acquittal or conviction on one of the charges of incest would not have barred prosecution on any of the other charges.

¶42     Hamilton offers the holdings in *State v. Weaver*, 1998 MT 167, 290 Mont. 58, 964 P.2d 713, and *State v. Harris*, 2001 MT 231, 306 Mont. 525, 36 P.3d 372, in support of his argument that his actions constituted a "continuous course of conduct" that must be viewed as a single offense for which a single sentence must be imposed. We held in *Weaver*, as we explained in *Harris*, that a specific unanimity instruction is required when

16

different criminal acts are charged in one count which raise "a genuine possibility . . . that different jurors will conclude a defendant committed disparate illegal acts subsumed under the single count." *Harris*, ¶ 12. We reversed Weaver's conviction for failure to given a specific unanimity instruction. *Weaver*, ¶ 40. We also recognized a "continuous course of conduct" exception to this rule where "the criminal acts are so closely connected that they form part of one and the same transaction, and thus one offense." *Harris*, ¶ 12 (quoting *Weaver*, ¶ 35). In *Harris*, the defendant was likewise charged with a single count; in that case, incest. The charge alleged conduct between Harris and his adopted daughter over an eight-year period. We rejected Harris's claim that he was entitled to a specific unanimity instruction, concluding that his actions created no genuine possibility of jury confusion because his actions were "so closely connected as to be properly viewed as a single, continuous, running offense" which fell into the exception to the *Weaver* rule. *Harris*, ¶ 15.

¶43    Here, however, we are not faced with a single charged offense and the question of whether a specific unanimity instruction was necessary. The State charged Hamilton with multiple offenses, each offense based upon discrete acts which occurred within specific years. While the conduct underlying the charged offenses may have been similar and have continued over several years, it nonetheless constituted separate offenses under the statute and the State had discretion to charge the offenses separately. Section 46-11-404(1), MCA, provides:

> Two or more offenses or different statements of the same offense may be
> charged in the same charging document in a separate count, or alternatively,
> if the offenses charged, whether felonies or misdemeanors or both, are of

17

the same or similar character or are based on the same transactions connected together or constituting part of a common scheme or plan.

¶44 In *State v. Boe*, 143 Mont. 141, 388 P.2d 372 (1963), the defendant was charged with twenty-two separate acts of rape, for "wilfully, wrongfully, unlawfully, and feloniously" accomplishing an act of sexual intercourse with a fifteen-year-old female between November 20, 1961, to March 3, 1962. Boe was convicted on nine of the counts, and challenged his multiple convictions on appeal. *Boe*, 143 Mont. at 143, 399 P.2d at 373. Noting that "[t]he power of the Legislature to make provision for the uniting of separate offenses in separate counts is absolute, provided no constitutional restriction or guaranty is violated," we held that the separate acts were set forth as required by statute, and each was a separate offense, wherein acquittal or conviction on one did not affect any of the others. *Boe*, 143 Mont. at 146-47, 388 P.2d at 375.

¶45 Here, as in *Boe*, the State exercised its discretion to charge Hamilton with multiple separate counts of incest, for acts perpetrated by Hamilton upon B.H. in years 1997, 1998, 1999, 2000, 2001, 2002, 2003, and 2004. Hamilton's actions continued from year to year; however, each act within the year formed the basis for a separate charge of incest. Acquittal on one charge would not have affected the validity of the other charges. The decision whether to prosecute, and for what offense, lies in the prosecutor's discretion. *State v. Schmalz*, 1998 MT 210, ¶ 9, 290 Mont. 420, ¶ 9, 964 P.2d 763, ¶ 9. Therefore, each charge in the information was properly joined by separate count and there was no violation of double jeopardy. The District Court did not err in sentencing Hamilton for the eight separate counts of incest.

¶46    Affirmed.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS

Justice John Warner concurring and dissenting.

¶47    I agree with the Court that the judgment should be affirmed.  However, I dissent from the Court's decision that the issues it designates as (1)b and (1)c should be reserved for a possible petition for postconviction relief.

¶48    I would conclude that Hamilton's counsel was not ineffective when he did not object to Detective Shaffer's testimony, because such testimony has not been shown to be inadmissible or prejudicial.  I would also conclude that the record is clear why Hamilton's counsel made the remarks in closing argument that his appellate counsel now complains about.  Thus, these matters should not be preserved for postconviction relief.

¶49    Relating to the claim of error because Detective Shaffer was allowed to give expert testimony about Hamilton's truthfulness, Hamilton does not, in my view, successfully argue that such testimony was inadmissible.  As Hamilton notes, it is well settled in Montana that the determination of the credibility of witnesses and the weight to

19

be given their testimony is solely within the province of the jury. It is also improper for an expert to testify regarding malingering and the statistical percentage of false accusations of sexual abuse. *State v. Brodniak*, 221 Mont. 212, 222, 718 P.2d 322, 329 (1986). However, in this instance, the witness, Shaffer, testified concerning the techniques he used in his interview of Hamilton and stated the purpose of these techniques. He also described Hamilton's demeanor. Shaffer did not say that Hamilton could not be believed, nor did he comment on his credibility. Also, he was closely cross-examined on these points. As it is not shown that admission of Shaffer's testimony constitutes error, it is not shown that counsel was ineffective for not objecting to its introduction. Also, considering all of the evidence, it is certainly not shown that the outcome of the trial would probably have been different had the jury not heard such testimony. Therefore, Hamilton's counsel was not ineffective for not objecting.

¶50 As the Court notes at ¶ 28, Hamilton's argument concerning the ineffectiveness of his counsel for failure to object to Shaffer's description of his interview with B.H. is entirely speculative. Thus, this argument is not sufficient to meet the two-step *Strickland* test to establish ineffective assistance of counsel, no matter if it is made on direct appeal or in a petition for postconviction relief.

¶51 There can be no doubt that the evidence did not paint a pretty picture of Hamilton. Whether the jury felt the State had proved its case, its members most probably were not going to invite Hamilton home for dinner. The purpose of counsel's remarks in closing argument, as described by the Court in ¶ 30, is clear from the record. The argument was obviously to make the point to the jury that, even if they were disgusted with Hamilton,

20

they could not convict him just because they did not like him. Appellate counsel may not have been quite so descriptive in his presentation. However, trial counsel did make his point and his argument is strongly presumed to be a sound trial strategy. In my view it is within the wide range of reasonable professional conduct.

¶52    I conclude that the issues designated by the Court as (1)b and (1)c should be disposed of in this direct appeal and not preserved for a petition for postconviction relief. I dissent from the Court's decision not to do so.

/S/ JOHN WARNER